2022 IL App (2d) 200455
No. 2-20-0455
Opinion filed December 28, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-1453 |
| DOUGLAS WILLIAMS, | ) ) | Honorable Debra D. Schafer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Hutchinson and Brennan[1] concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial in the circuit court of Winnebago County, defendant, Douglas
Williams, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1), (b)(16) (West 2018)). The
trial court sentenced defendant to a term of 70 years' imprisonment. Defendant appeals, raising
the following issues. First, defendant argues that the trial court erred in honoring his personal

_____

[1]Justice Brennan participated in this appeal, but has since been elected to the Third District
Appellate Court. Our supreme court has held that the departure of a judge prior to the filing date
will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v.
Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

demand to proceed to trial over the objection of his own attorney and "in the midst of an unprecedented global pandemic." Second, defendant argues that the trial court erred by refusing to ask potential jurors during *voir dire* certain questions tendered by defense counsel designed to elicit COVID-19-related concerns and possible biases. Third, defendant argues that other COVID-19-related measures, including mandatory masking of the venire and social-distancing protocols, denied him a fair trial. Fourth, defendant argues that he was denied a fair trial where the State was permitted to introduce a preinterrogation video of him cursing and acting belligerently. Fifth, defendant argues that he was denied a fair trial by the State's remarks regarding his demeanor made during closing argument. Finally, defendant argues that he was denied a fair trial where the trial court allowed the jury to view "gruesome [and] unfairly prejudicial" crime scene and autopsy photographs of the victim, Samuel Randolph. For the reasons set forth below, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant's conviction stems from events occurring in Rockford in the early morning hours of April 7, 2019, during which Randolph was beaten to death. Defendant was initially charged in a three-count criminal complaint with various offenses related to Randolph's death. On July 10, 2019, a grand jury returned an indictment against defendant, charging him with seven counts of first-degree murder (720 ILCS 5/9-1(a)(1), (2), (b)(16) (West 2018)). Several counts of the indictment alleged that Randolph was a person 60 years of age or older at the time of the offense and that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

¶ 4                                    A. Trial Demand

¶ 5      On June 13, 2019, defendant appeared before the trial court for arraignment on the charges alleged in the criminal complaint. In response to inquiries from the court, defendant stated that he

was 56 years of age, that he had finished school, and that he could read, write, speak, and understand English. Defendant also indicated that he viewed a video that explained his rights, that he understood his rights, and that he received a copy of the complaint filed against him. The court then reviewed with defendant each of the three counts of the complaint and the potential sentences. Defendant pleaded not guilty. The parties next appeared before the court on July 12, 2019. At that hearing, the court informed defendant that the grand jury had returned a seven-count indictment against him. Defense counsel waived a formal reading of rights, charges, and possible penalties and entered a plea of not guilty on all counts.

¶ 6     At a status hearing on October 18, 2019, defense counsel asked the court to set the matter for trial in January. The State agreed, and the court set the matter for January 21, 2020. On January 3, 2020, the State asked for a continuance because the case had been reassigned to a different prosecutor. Over defendant's objection, the court granted the motion to continue trial until February 18, 2020.

¶ 7     On February 13, 2020, the State moved for a continuance, citing (1) outstanding DNA evidence and (2) the reassignment of the case to yet another prosecutor. During the hearing, defendant repeatedly asked about the 120-day speedy-trial term. The State responded that no more than 60 days would be attributable to it as of February 18. Defense counsel indicated that the State's estimation was correct. Moreover, defense counsel did not object to the continuance, noting, among other things, that the DNA evidence could potentially exclude defendant as the offender. Ultimately, the trial court granted the State's motion and continued the trial to March 2, 2020. At a status hearing on February 21, 2020, the court continued the case by agreement of the parties and set trial for April 6, 2020.

¶ 8 On March 20, 2020, defense counsel filed a motion to continue the trial due to the COVID-19 pandemic. At the hearing on the motion, defense counsel expressed concerns about defendant's ability to receive a fair jury trial during the pandemic. Defense counsel requested that the matter be continued to May or June. Defendant voiced his opposition to the motion. The State did not object to the motion. The trial court did not rule on the motion on that date. At a hearing on March 24, 2020, the court told defendant that "the [Illinois] Supreme Court has indicated basically all speedy trial demands are on hold" due to COVID-19. Defendant responded, "Well, I still want mine, and I ain't changing my mind." The trial court then set the case for a jury trial on June 1, 2020, over defendant's personal objection.

¶ 9 On May 15, 2020, defense counsel filed a motion to continue trial. A hearing on the motion was held on May 21, 2020. At that hearing, defense counsel argued that, due to COVID-19, a jury would not be able to focus on evidence or deliberate fully and, therefore, there was no way to have a fair trial under the circumstances. Defendant told the trial court that he wanted to proceed with the trial, stating:

> "I'm not accepting no damn continuance. That's it, that's all. *** I'm ready to—
> let's do what's got to be done and I want to go to trial because I'm tired of sitting here in
> jail. Period. I say, let's go. I'm not accepting no continuance. Period. That's it, that's all.
> Y'all already got 180 days at me. You have 60 days. He has 60 days and the prosecutor
> attorney has 60. That's 180 plus days. As far as I'm concerned, I'm ready to go. Let's go.
> I don't care how y'all do it. Let's go. And I'm not accepting no damn continuance and
> that's what I mean."

The court told defendant that it wanted to explain how a trial would be conducted during the pandemic. Defendant responded, "I don't really care. I don't care. All I want—what I want all the

rest of days going straight to my 120. I am not accepting no doggone continuance. Period." The court then informed defendant that a trial conducted during a pandemic would be different. The court stated that defendant's case would act as a "guinea pig," since it would be one of the first trials held during the pandemic. The court noted that, due to issues of social distancing, trials would be conducted in only the two largest courtrooms. The court further noted that the jurors would be spread out throughout the courtroom, perhaps seated in a way that they could hear defendant's conversations with defense counsel or see defense counsel's computer screen. The court also indicated that the jury-selection process would take longer because of limits on the number of potential jurors they could *voir dire* at one time and that the jury deliberation room would be rearranged to promote social distancing. The court asked defendant if he had any questions about the procedure for the trial. Defendant responded, "No. I'm just ready to go and I ain't accepting nothing less. Let's go for the trial and that's what I mean." The State indicated that it had no objection to a continuance. In response to an inquiry from the court, both sides indicated that, other than the COVID-19 issues, they were ready to proceed to trial. The court then took a recess to consider its ruling.

¶ 10 Following the recess, defense counsel argued that it was the attorney's decision, not defendant's, to continue trial. The trial court then explained additional procedures that would be implemented because of the pandemic. The court stated:

> "As of June 1st, *** that will be the first day that we are sort of reopening after the COVID-19 pandemic. *** [W]e haven't had jury trials, since, I think, sometime in March ***. So at this point, we don't know exactly how it's going to work. Physically, we know and we understand that there has to be social distancing. We understand that that is going

to require rather than having jurors sit in the jury box, they're going to have to sit within the well of the court so they can maintain distance from one another.

We know that we have room for 12 people to do that and if we have alternates, *** they'll have to be in the audience. Obviously, we're going to put them as close as we possibly can, but we can't keep [the alternates] together with the jurors. We haven't talked about the number of alternates, but that would relate to any alternates at all. I assume, [defense counsel], you wouldn't have had this conversation yet with [defendant], but to— if it was important to somebody to have all the jurors together, kind of as a cohesive group, you could agree to have a unanimous jury of not less than 10 so that you only pick 12 jurors and there's the possibility that one or two have an emergency; get sick, whatever the matter is, but if the number fell below 10, then there would be a mistrial.

* * *

We have concerns about having alternates in the audience and we'll have to make sure that they aren't exposed to the things that the attorneys are doing; to any conversation between [defendant] and [defense counsel]; to any communication that [the prosecutor] has with co-counsel. Normally the jurors are sequestered, not for the whole trial, but during the course of the trial and kept away from other things that are happening in the courtroom. It's going to be harder to do that, but we're going to have to—if you want to have your jury trial, we will do out [*sic*] very best to make sure that happens. I just want to make sure you understand that that is the environment in which you are demanding this trial go forward not next week, the week after next.

Jurors are not going to be required to wear masks unless they are exhibiting coughing or that sort of thing, in which case, we can order them to wear a mask. That may

make some people nervous for others around them not wearing masks. We're simply not sure what the jurors' response to that is going to be. Everyone in the courtroom—I'm distanced mostly from everyone else just by virtue of where I'm seated and other than when they're speaking, they're probably going to have to wear a mask.

Accommodations are going to have to be made if all the lawyers are sitting at the table wearing masks and you are wearing a mask, Mr. Williams, if any witnesses ask to identify the person who is alleged to have said something; done something in connection with your case, we're going to have to figure out how it is—I can't just have you pull down your mask because that's telling the witness to pick you as the person who did it. So we're going to have to think through exactly how to make that happen and it may be that I require everybody who's in the audience, non-jurors, to remove their masks so that the person who is being asked to make an identification, can do that from amongst a group of people."

Defendant subsequently told the court:

"I'll tell you what, out of the kindness of my heart and the Father and the Son and the Holy Ghost, go ahead and continue it until y'all says it fine [*sic*]. Other than that right now, y'all leave me alone until y'all get ready to let's do this."

Thereafter, defense counsel suggested a trial date early in July or August. The trial court stated that it would prefer a July date and suggested July 6 or July 20. The State requested July 20 and defense counsel stated that he was available that date. The court then stated that it would grant the motion to continue and strike the June 1 trial date. However, shortly later, defendant stated that he did not want a continuance and that he wished to proceed to trial. After discussing additional concerns with holding the trial on June 1, the court asked defendant if he still wanted to procced

to trial on that date. Defendant responded in the affirmative. The court then stated that it would hold the trial on June 1.

¶ 11 At a status hearing on May 28, 2020, the trial court noted that it had denied defense counsel's motion to continue the trial. Defendant stated that he did not "want to stop nothing" and that he wanted "to move forward." The court assured defendant that his trial was set for June 1. Defendant responded, "And if he try to continue it [*sic*], I do not want him to continue. I want it to go." A short time later, the following colloquy occurred between the court and defendant:

"THE COURT: *** One thing that I wanted to talk directly to you about, you know, from the fact that your attorney filed a motion to continue that he thinks it's in your best interest to not try the case and would rather try the case in that date we selected in July.

THE DEFENDANT: And I'm going on what I said. That's it. That's all. I don't even want to hear nothing else about it.

THE COURT: There are some things that I have to ask about and put it on the record, so I have to make these comments. I understand you're opposed to that, and that's why we're going forward with the trial that's scheduled for June 1st.

When we talked about this *** last week, I talked to you about all the things we simply don't know. We don't know what the jurors are going to say. We don't know if the jurors are coming. We don't *** know how many problems and specifically what problems are going to be created because this is the first trial in the pandemic.

Understanding all of that and understanding that it's your attorney's advice to continue the trial and have this set in July when we have a better handle on things or what we hope would be a better handle, is it still your wish to go forward with the trial on June 1st?

THE DEFENDANT: Yes.

THE COURT: All right. Even though that's against your attorney's advice.

THE DEFENDANT: I don't care about what he's saying. I'm caring about what I'm saying.

THE COURT: Okay. The reason I'm bringing that up is because in the event that you are convicted and your case goes up on appeal, I just want to make sure that everyone understands that we're going forward because that's what you're requesting to have done, not because I'm making you do it.

THE DEFENDANT: Absolutely.

\* \* \*

THE COURT: Do you have any questions?

THE DEFENDANT: No. Let's just get on with the trial that's all."

On June 1, 2020, defendant's jury trial commenced as scheduled.

¶ 12                                    B. *Voir Dire*

¶ 13    With regard to COVID-19 concerns, the court told the attorneys they would not be allowed to question the jury during *voir dire* about COVID-19, but it permitted them to submit questions to the court for it to ask. The defense submitted a series of written questions, including the following: (1) "Will your feelings about the ongoing COVID-19 pandemic impact your ability to serve as a juror and to be fair and impartial to the parties? If so, please explain"; (2) "If chosen as a juror will you feel comfortable deliberating with a fellow juror who perhaps has not taken the same precautions you have?"; and (3) "Will your concerns about being in a confined space with eleven other people impact your ability to serve as a juror and to be fair and impartial to the parties?"

¶ 14    During *voir dire*, the prospective jurors were divided into two separate groups. When the first group was brought into the courtroom, the trial court informed the prospective jurors about various COVID-19 safety measures that had been implemented in the courthouse:

"Welcome to Courtroom D where you may be called upon to serve as a juror in this case. This is a most unusual time for all of us.

\* \* \*

For those of you who have not served on a jury before, you don't necessarily know that this isn't normally how the courtroom is laid out. Normally speaking, everyone is in the jury box; but with the times that we're in, in order to provide the safety precautions necessary, we've had to spread you out. The parties are sitting differently, and, of course, most of us are wearing masks.

There's a point in time where I may be wearing a mask. Unfortunately, to make sure the court reporter can take down what's being said, when I'm talking, I'm not going to be able to wear one, just like, when you're talking, you may not be able to as well. When you're not speaking, though, I would ask that you keep the mask on.

Because the courts are providing essential services, we've never been subject to the court—the governor's shutdown order. Out of an abundance of caution, however, the [Illinois] Supreme Court did reduce court activity starting in mid-March, but there are some things that cannot wait indefinitely.

The [Illinois] Supreme Court has authorized courts to return to our regular schedule effective today, and there are a number of procedures that we've implemented to guard against the spread of coronavirus. The courtrooms have been sterilized, and frequently

touched surfaces will be resterilized during the course of the trial. The courtroom is laid out to maximize social distancing for everyone's protection.

It is necessary that you wear masks during the trial. Jurors and lawyers may remove their masks when speaking on the record, such as when you are answering questions. As you can see, I'm up here separated from you and—by the distance so that hopefully there is no issue, but I will probably be wearing a mask at other times when it's appropriate.

We're going to proceed today because doing so is essential. This is a trial where both sides are looking to get a fair trial. We're just hoping to address any concerns that you may have given the ongoing pandemic.

\* \* \*

If during the course of this procedure if [*sic*] you're selected as jurors and while during the jury trial if you have any suggestions, if there's some things that you see happening that make you feel unsafe, I would urge you to bring that to the attention of my bailiffs. It obviously wouldn't be done intentionally to make you feel unsafe, but if there's some way that we can correct it, I'd like to know what it is.

We spent a lot of time thinking about how to address this in the best way possible, the seating and all of this, but there may obviously have been some things that we missed; so please don't feel like you can't bring this to our attention if you feel you need to."

¶ 15    A short time later, the court informed the first group of prospective jurors about additional safety precautions that would be taken because of the pandemic:

"Concerning the COVID-19 pandemic, is there—I guess what—does anyone have any concerns, given what I talked [about] \*\*\*

Let me give you an idea of what to expect. This is how the jury would be laid out during the course of the trial. Obviously, the parties would be careful not to be coming within six feet of the people who are in the front row. It's a lot easier for the ones who are in the back, except maybe as a witness passes by to come into the—take the stand.

In back, I think that you were separated into two rooms. When we take breaks, you'll still be in those two rooms; so it's fewer people combined in a courtroom—or in any particular room.

There's wipes back there. There's hand sanitizer. I have hand sanitizer out here. I don't know whether or not you're going to be asked to pass around any piece of evidence, but I'm obviously happy to provide hand sanitizer if you're asked to do that. That doesn't happen a lot anymore.

During jury deliberations, our current plan when the 14—or 12 of you would have to be together would probably take place in this courtroom so that you can separate out.

There is recording that's going on at all times. That would be turned off. The video that is going on at all times would be turned off so that it would be private, but it's just giving you a larger room to work with. The windows would be blacked out. You wouldn't be able to use—to go out that door. (Indicating.) The bailiffs would be on the other side of the door. It's really the same as jury deliberations in one of the rooms that some of you were in but putting it on a larger scale.

During the course of the trial, we have to have, just for the distancing purposes, two of the jurors sitting out in the audience. Other than the very last row, there won't be anyone else who's on this side of—because I can't have the public mixing with the jury during the trial. There may be some people who are seated on this side if some people choose to come

and watch the trial, but it's obviously keeping the numbers in the courtroom down from what it might be under different circumstances. So I just wanted to make you aware of some of the things that we're doing in order to try to keep you all safe.

Understanding all of that and my earlier comments, does anyone have any concerns that they want to raise concerning jury service during the pandemic? I guess, if you do, please raise your hand."

No prospective juror raised his or her hand. The court continued:

"Do all of you feel like you would be able to concentrate on the evidence and give this case your full attention, despite anything else that's going on outside of this courtroom, whether in your personal life or just in the community generally?"

No prospective juror raised his or her hand.

¶ 16    After the parties finished selecting jurors from the first group, the second group of prospective jurors was brought into the courtroom. The trial court provided the second group with essentially the same information about the COVID-19 safety measures that were being implemented as it did with the first group. The court stated:

"Welcome to Courtroom D where you may be called upon to be a juror in this criminal case that's pending today.

This is a most unusual time for all of us. I don't know how many of you have been called for jury service before. If you have, it didn't look anything like this. If you haven't, I guess you don't know any different, but still I'm sure you can imagine it's a little weird because we're all masked up.

Because the courts provide what are quote/unquote 'essential services,' we have never been subjected to the governor's shutdown order; and out of an abundance of caution,

however, the [Illinois] Supreme Court has reduced court activity since mid-March. There are some things that cannot wait indefinitely, though. The [Illinois] Supreme Court has authorized the courts to return to our regular schedule effective June 1st, but there are a number of procedures that we have implemented to guard against the spread of coronavirus, working in conjunction with the Winnebago County Health Department.

Courtrooms have been cleaned, and frequently touched services [*sic*] will be recleaned throughout the day. The courtroom is laid out to maximize social distancing. Jury trials don't normally look like this. We don't normally have jurors who are sitting out in the audience. We normally have everyone contained within the jury box, or sometimes we have some additional chairs in the well. But we've had to spread it out just for your safety and everyone's safety.

It is necessary that you wear masks during the trial. Jurors and lawyers may remove their masks when speaking on the record, such as when answering a question. So the lawyers pretty much, with the first panel that we went through, were isolating questions to one juror at a time. I would just ask that you remove your mask when you're answering questions so that everyone can see your face fully.

There may be times when I have a mask on; times that I don't. Some of it is because I'm far enough away that hopefully I'm not presenting any issues for anyone. Other times, I may have it on.

We're going to proceed today because doing so is essential, and, also, we have taken these additional steps in hopes that we can safely move forward and also continue to do the job that we're here to do.

* * *

We're *** doing this in a unique environment, one that we haven't all experienced; so there may be some bumps along the way, but I'm trying to minimize that as much as possible.

We've tried to anticipate all the issues that may come up relating to the COVID-19 pandemic. As I said before, you don't—may not know any different, but we have you spread out and that's done for your safety. You're being required to wear the masks for your safety.

During deliberations, rather than in one of the rooms that you just came from, we're probably going to have you deliberate here in the courtroom so that you may have more room, you can spread out, and everyone can remain safe.

If, during the process, you identify some things where you didn't feel safe for any reason or something else that needs to be done, I'm happy to take suggestions; and please bring anything to the attention of [the bailiffs], and they can pass the information along to me. If it's a change that we can make, we'll certainly try to accommodate that.

As far as concerns about the pandemic, I guess my prior comments just indicated that we're trying to do everything possible to keep you safe. Does anyone have any particular concerns that you wish to raise at this time concerning the pandemic? If so, raise your hand."

No prospective juror raised his or her hand.

¶ 17 During jury selection, prospective jurors were able to remove their masks when being questioned individually, though some jurors were questioned with their masks on.

¶ 18                                   C. Pretrial Proceedings

¶ 19    Before trial began, defense counsel objected to the COVID-19-related rearrangement of the courtroom. Counsel argued that the jurors were seated 40 feet away from the witnesses and were facing the court and the State. Counsel further argued that the guards and the bailiffs were standing behind the defense, creating the false impression that defendant was especially dangerous. The court responded that the jurors are angled "towards the parties, generally" and "not towards the witness box." The court stated that, when a witness is testifying, it would tell the jurors that they are free to angle their chairs at the witness rather than the courtroom generally. In addition, the court stated that the guards "need to be where the jail guards are," but agreed to have the bailiffs sit in a different location.

¶ 20    The State planned to introduce two videos at trial. The first video was a prearrest, pre-*Miranda* recording of defendant in a holding room at the police station (hereinafter, the preinterrogation video). The second video was the electronically recorded interrogation of defendant by various law enforcement officers (hereinafter, the ERI). Defendant filed a written motion *in limine* to bar admission of the preinterrogation video. Counsel argued that the video, which showed defendant cursing and acting belligerently, was irrelevant except for a statement at 7:01 a.m. in which defendant told officers that "someone murdered his best friend and he nearly stepped on him when he came in." Defendant further argued that, to the extent the video was relevant, any probative value was outweighed by its prejudicial impact. Finally, defendant claimed that the video was cumulative of evidence that the jury would likely see on the ERI, which shows defendant engaged in similar behavior.

¶ 21    At the hearing on the motion, defense counsel essentially reiterated the arguments made in his written motion. The State responded by noting that this was a circumstantial case and that the preinterrogation video was "the closest thing that [it has] to the defendant's demeanor at the time

of [the victim's] death, closest thing we have to his state of mind, and that's what this video tends to show." The State acknowledged that the ERI also contained "some outbursts" by defendant, but it contended that, by the time of the ERI, defendant "had a chance to sober up a little bit" and the outbursts on the ERI were "not of the same quality and quantity" as those in the preinterrogation video. The State also argued that the preinterrogation video was relevant because defendant's statements therein were inconsistent with statements he later made during the ERI. The court allowed the preinterrogation video into evidence. The court reasoned that, to the extent defendant made statements in the preinterrogation video that are inconsistent with statements during the ERI, "that *** can be considered and should be considered by the jury for whatever it's worth, but I don't know if an argument is going to be made that [defendant] was too drunk and didn't know what he was saying." The court added that defendant's demeanor "is something that can be evaluated by the jury; so I think that they're entitled to see the recording."

¶ 22                           D. Trial Testimony

¶ 23    The following testimony and evidence were presented at defendant's trial. Debra Peterson, a dispatcher for the Rockford Fire and Police Departments, testified that, at about 4:08 a.m. on April 7, 2019, she received a 911 call from an individual who identified himself as defendant. A recording of the call was played for the jury. On the call, defendant said he saw his roommate (Randolph) lying in a "puddle" of blood and that he believed that Randolph was dead. Defendant said he had not put his hands on Randolph. Peterson asked defendant to check if Randolph was breathing. Defendant refused, saying that he did not want to put his hands on Randolph. Defendant further told Peterson that he and Randolph had been at a party and that Randolph left the party about two or three hours before him.

¶ 24 Officer Jhordynne Alexander, a patrol officer with the Rockford Police Department, testified that she was dispatched to 621 Alliance for a welfare check the morning of April 7, 2019. When Alexander arrived, she observed an individual later identified as defendant standing on the front porch. Alexander testified that defendant was "visibly intoxicated" when she encountered him. Defendant told Alexander that he saw Randolph on the floor surrounded by blood after defendant returned home. Alexander checked the rest of the home but found no other people or signs of forced entry. Defendant told Alexander that he and Randolph had been at a party earlier, which Randolph left first. When defendant returned home, he unlocked the door and saw Randolph on the floor in a pool of blood, but he did not enter the home. Alexander testified that from the front door she could see only Randolph's legs, not his head or the pool of blood. Alexander noticed blood spatter on defendant's clothes and scratches on his arm. After securing defendant in her squad car, Alexander returned to the residence and searched for a weapon. She located what she described as a large wooden stick in the bushes outside the front door. Alexander testified that the stick appeared to have red smears on it, so she notified her supervisor.

¶ 25 Officer Douglas Ivy of the Rockford Police Department testified that he was also dispatched to 621 Alliance Avenue shortly after 4 a.m. on April 7, 2019. Upon his arrival, Ivy met with an individual who was on the house's front porch. That individual was later identified by stipulation as defendant. Ivy asked defendant if there were any weapons or pets in the house. Defendant responded that there was a dog, but no weapon. Ivy and defendant entered the residence, at which point defendant picked up the dog and placed it in a bedroom. Other responding officers testified that the dog, which belonged to Randolph, did not appear to have any blood on it.

¶ 26 After escorting defendant back outside the house, Ivy and Alexander "checked and cleared" the residence. Ivy observed a deceased individual. There was blood spatter around the individual,

and he was surrounded by a pool of blood. The individual appeared to have injuries to his head. Ivy testified that the blood around the individual's body was drying, suggesting the body had been there awhile. Ivy testified that there did not appear to be any type of illegal entry into the home. After the residence was secured, Ivy canvassed the area. Other responding officers notified Ivy that a possible weapon was located in the front yard, underneath some bushes. Ivy then reentered the house, where, in a bedroom, he located a stick matching the one found outside. Ivy described the stick found in the bedroom as brown in color and several feet long.

¶ 27     Sergeant Bruce Voyles of the Rockford Police Department testified that in April 2019, his rank was that of detective. At approximately 6 a.m. on April 7, 2019, Voyles was notified of a homicide investigation at 621 Alliance Avenue. Upon his arrival, Voyles was directed to what he described as a "club" that was located under some shrubbery outside the front entrance of the residence. Voyles testified that the club measured 40 inches in length. It was made of wood, brown in color, tapered, and had carvings and metal studs. On the club, Voyles observed a black hair and a dried, reddish substance that looked like blood. Voyles photographed the club, collected it, and secured it at the police station. He also took two swabs of the dried, reddish substance on the club and collected the hair. Additionally, Voyles conducted a search of the exterior and interior of the residence. He did not observe any signs of forced entry. Voyles testified that there were televisions on the front porch, with a red substance on them that other detectives swabbed. The substance from the televisions tested negative for the probable presence of blood.

¶ 28     Officer Allison Lisney, an animal control officer with Winnebago County Animal Services, testified that, at approximately 5:30 a.m. on April 7, 2019, she received a report that there was a dog at 621 Alliance Avenue in Rockford that needed to be removed. Upon her arrival, Lisney entered the house, where she located a small, black-and-white pit bull female in one of the

bedrooms. Lisney testified that the dog had a "clean coat" and there was no blood on the dog. Lisney took the dog into her custody and placed it in her van. A microchip scan later revealed that the dog belonged to Randolph.

¶ 29    Dr. Mark Peters, a forensic pathologist, was tendered as an expert and testified that he performed the autopsy of Randolph. Dr. Peters testified that Randolph was 64 years of age at the time of death. Randolph had numerous overlapping head injuries, including fractures, brain lacerations, and brain hemorrhaging. Most of the lacerations were concentrated on the center part of Randolph's forehead and face, with abrasions a little bit heavily weighted towards his right side. There was also a posterior scalp laceration on Randolph's right side. Because of the overlapping nature of the head injuries, Dr. Peters stated it was impossible to determine the exact number of impacts. Dr. Peters also noted an abrasion on the back of Randolph's left hand, contusions over the knuckles of Randolph's right hand, and blood spatter on Randolph's left hand. Other than the abrasions and contusions to the hands, Randolph had no injuries below the shoulders. During the autopsy, Dr. Peters collected blood standards, nail clippings, head hair combings, swabs of oral mucosa, and swabs of the mouth, penis, and anus. He tendered this evidence to the police. Ultimately, Dr. Peters testified that the cause of Randolph's death was blunt force trauma, and he identified the manner of death as a homicide.

¶ 30    At a sidebar during Dr. Peters's testimony, defense counsel objected to 15 of the 40 autopsy photographs the State planned to show. Noting that he was not contesting the cause or manner of Randolph's death, defense counsel asserted that the photos were "excessive," "duplicative" of other photos, and "very gruesome." After a discussion between the parties and the court, the State agreed to limit the number of photos to "less than a dozen," including three of the photos to which defense counsel objected. In response, defense counsel maintained his objection to two of the

photographs—State exhibit Nos. 65 and 66. The court asked defense counsel if he believed that the two photographs were "covered in other photos." Defense counsel responded, "there's no ruler in—with respect to No. 65, in any other photos" and he did not believe "that in any other photos did they open Mr. Randolph's mouth as they are doing in No. 66." The court overruled the objection. The court acknowledged that the depictions in the two contested photos were "gruesome," but it stated that they accurately reflected the injuries. The court further explained that one of the photos showed the victim's mouth—which was not depicted in any other photo— and the other photo was "helpful" as it showed the victim's head injury with a ruler.

¶ 31    After the State resumed questioning Dr. Peters about the exhibits, the court remarked that, "[s]ometimes when the parties get close, their voices drop." The court then asked the jurors if they were still able to hear Dr. Peters.[2] Following a brief exchange between the court and the attorneys, the court noted that one of the jurors asked that Dr. Peters keep his voice a little louder. Dr. Peters agreed to do so. Subsequently, the State questioned Dr. Peters about its exhibit Nos. 65 and 66. Dr. Peters testified that State exhibit No. 65 was a photograph depicting Randolph's head and face with a portion of the skull missing and a ruler to show the dimensions of the wound. Dr. Peters testified that State exhibit No. 66 was a photograph depicting Randolph's mouth with his upper and lower lips peeled back showing his broken teeth and lacerations on the inside of the lips.

¶ 32    Detective Nathan Kohanyi of the Rockford Police Department testified that, at around 10:25 a.m. on April 7, 2019, he was dispatched to 621 Alliance Avenue to assist with a murder investigation. After being briefed by the officers on scene, Kohanyi began to document the crime

---

[2] It is unclear how the jurors responded, as the transcript states only that they did respond, after which the court remarked "Okay. Thank you."

scene and collect evidence. Kohanyi collected a stick from a bedroom in the home. Kohanyi took the stick to the police department, where he photographed it with a scale to show its size and tagged it into evidence. Kohanyi testified that the stick was about 41 inches long and about 2 inches in diameter. Kohanyi estimated that the stick weighed "[a] few pounds." Among the other objects Kohanyi found in the same room as the stick was a pair of blue shoes with a red substance on them that resembled blood. Kohanyi testified that he swabbed the inside and outside of the shoes. He used the same swab on the outside of both shoes.

¶ 33    Kohanyi further testified that he later photographed defendant's injuries and collected his clothes, which had flecks of blood on them. During a break, and outside the presence of the jury, the court informed the parties that a juror had indicated that he was "having a hard time hearing with some of the witnesses," so the court was moving the juror "up to the front and putting the younger ears further back, so—to make sure he can hear and see things." While Kohanyi was testifying, the State introduced many exhibits. The court expressed concern that the jurors may be "stressed about what they can't see from a distance" and, with the permission of the attorneys, told the jurors that the exhibits would be sent back during deliberations. While Kohanyi was testifying about some of the exhibits, the court also asked the attorneys if either side had a problem if it brought two additional chairs "into the well" so the alternate jurors would have a better view of the exhibits. Kohanyi testified to various photographs that he took of the crime scene, including State exhibit Nos. 130, 136, 137, and 138, which depicted Randolph's body lying on the floor at the crime scene. Defense counsel did not object to the admission of these exhibits.

¶ 34    Jerome Cole, defendant's brother, testified that, in April 2019, he lived at 721 Miriam Avenue in Rockford. Defendant and Randolph lived on Alliance Avenue, about two blocks away from Cole. On April 6, 2019, Cole threw a birthday party for his wife at his house. The party

started at about 10 p.m. About 10 to 15 people attended the party, including defendant and Randolph. Cole testified that he drank his "share" at the party. The party ended at one or two in the morning. Cole testified that defendant left before the party was over, although he was not sure of the time of defendant's departure. After the party, Cole went to bed. Cole woke up about three or four hours later, when defendant knocked on his bedroom window. Defendant told Cole that he had been at a friend's house before going home and, when he arrived home, he found Randolph "stretched out by the kitchen," with blood "coming from him somewhere." Defendant stated that he needed to use Cole's phone to call 911, because his phone battery was "down." After defendant called 911, Cole instructed defendant to return home to wait for the police. Cole did not recall what defendant wore to the party or what he was wearing when he came and knocked on the window.

¶ 35    Cole further testified that the police came to his home to speak with him on the morning of April 7, 2019. Cole was later interviewed at the police station. Cole testified that he was "still pretty tired" during the interview at the police station. The State played a recording of Cole's interview, in which he said that the party ended around 11 p.m. or 12 a.m. and defendant came back three or four hours later. Cole told the police that, when defendant came back, defendant was wearing blue jeans, a shirt, and a light tan jacket he had also been wearing at the party. Cole told officers that he did not know where defendant had gone after the party.

¶ 36    Over the course of two days, the State played the preinterrogation video and the ERI for the jury. The preinterrogation video was edited to exclude three hours of defendant sleeping. As edited, the preinterrogation video starts at about 6:26 a.m. on April 7, 2019, and lasts for approximately 80 minutes. It shows defendant at times pacing around the interrogation room, talking to himself, trying to leave, setting off the room alarm, and yelling things like, "Tell them m*** come on, I'm ready to go home," "I got to p***, m***," "Tell the m***, look, I want my

s***," and "Ya'll m*** better come on." The ERI was over four hours in duration and showed defendant being interrogated by Detectives Gulley and Shelton, and later by Detectives Bootz and Kennedy. During the ERI, defendant initially stated that, when he returned from the party, Randolph was on the floor, that he did not touch Randolph, and that he did not know who hurt him. Later, he told officers that it was possible that someone named "Rick" killed Randolph. Subsequently, defendant stated that he was present when Randolph was killed but that it was Rick who committed the crime. According to defendant, Randolph and Rick were involved in a physical altercation when defendant entered the house. At one point, defendant stated that he did not know what Rick hit Randolph with, because he did not see it. Defendant later stated that he saw Rick hit Randolph with a piece of wood while Randolph was on the floor. Defendant stated that blood got onto him when Rick was hitting Randolph. Defendant also stated that blood must have splashed onto his coat when Rick and Randolph were fighting. Defendant denied killing Randolph. At the beginning of the second day of videos being shown, a juror asked for the volume to be turned up. The court complied with the request.

¶ 37    Detective Bradley Shelton of the Rockford Police Department testified that as part of the investigation, and with defendant's consent, he collected a buccal swab from defendant. Shelton also testified that he learned that defendant's date of birth was January 13, 1963, and Randolph's date of birth was November 20, 1954. Additionally, Shelton testified that he had the opportunity to go to both Randolph's residence (621 Alliance Avenue) and Cole's residence (721 Miriam Avenue). He testified that the distance between the two residences is just under two blocks.

¶ 38    Blake Aper is a forensic scientist in the biology/DNA section of the Illinois State Police Forensic Science Laboratory in Rockford. Aper has been a forensic scientist since 2001. Aper testified that his job entails analyzing evidence for the presence or absence of bodily fluids,

obtaining DNA profiles from evidence, and comparing unknown DNA profiles from a crime scene to the known standards he receives. Aper noted that a person does not always leave behind on items that he or she touches a DNA profile that is suitable for comparison. He explained that factors such as the duration of the contact, the nature of the item's surface (*i.e.*, rough or smooth), and the amount of pressure applied can affect whether a person leaves behind a "touch DNA" profile. Aper added that certain individuals tend to leave DNA behind more readily than others.

¶ 39     Aper testified that he derived DNA profiles for both defendant and Randolph and compared them to DNA obtained from various pieces of evidence. Defendant's DNA was not on the "club" found under the bushes, but Randolph's DNA was. Swabs from bloodstains on defendant's jeans, the blue shoes found in his bedroom, and defendant's t-shirt contained both Randolph's and defendant's DNA. Presumptive blood specks from defendant's coat collar contained defendant's DNA, while presumptive blood specks from the back of defendant's coat contained Randolph's DNA. On cross-examination, Aper acknowledged that the DNA on the pieces of evidence were from swabs he received that were "completed" by law enforcement officers not affiliated with his laboratory.

¶ 40     Detective Michelle Bootz of the Rockford Police Department testified that, at approximately 4:45 a.m. on April 7, 2019, she responded to a call of a deceased individual at 621 Alliance Avenue. After Bootz received consent to search defendant's cell phone, she extracted the phone's data, using one of the department's computers. Bootz testified that, when she first obtained the phone, she had to power it on. Bootz noted that she was able to power on the phone and that the phone indicated that the power level was "more than half." Bootz denied hearing a warning or audible signal indicating a low battery when she powered on the phone. On cross-examination, Bootz testified that, when she examined defendant's phone, it was not set to the correct date and

time. She also acknowledged that, when she plugged the phone into the department's computer, it showed the phone receiving "a small amount of charge at that point."

¶ 41    Following Bootz's testimony, the State rested its case. Defendant moved for a directed verdict, which the trial court denied. Defendant presented no evidence and rested his case.

¶ 42    During closing arguments, the State argued that defendant brutally and repeatedly beat Randolph to death with the stick and that, despite maintaining his innocence, the truth was shown through inconsistencies at his interrogation. The State argued that, if defendant were innocent, he would not lie to the police and try to leave the interrogation but would instead help with the investigation. Also, according to the State, there was no other way to explain the presence of Randolph's blood on defendant's clothes. Whoever killed Randolph had to have had keys, since there was no forced entry into the home. The State also commented on defendant's demeanor, during closing arguments. Defense counsel argued that, in the video statements, defendant was acting like someone who had been up all night drinking, as he had been. Counsel pointed out that defendant maintained his innocence throughout the interrogation and that, while his clothes had some blood on them, it was not an amount consistent with bludgeoning someone to death.

¶ 43    The jury found defendant guilty of first-degree murder on all seven counts. The jury also found that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and that the victim was a person 60 years of age or older at the time of the offense. The court entered judgment on count V of the indictment, with the rest of the convictions merging.

¶ 44    On July 1, 2020, defendant filed a motion for a new trial. Defendant argued in the motion that, among other things, the court erred in denying his uncontested motion to continue trial in the midst of the pandemic after it was previously granted. Defendant also argued that the court did not adequately question potential jurors during *voir dire* about serving during the COVID-19

pandemic. In this regard, defendant asserted that the court erred in declining to ask defense counsel's proposed *voir dire* questions on COVID-19. Defendant also argued that he was denied a fair trial because of the COVID-19 procedures implemented by the court. Notably, defendant asserted that, during jury selection, jurors were required by an order of the chief judge to wear masks unless they were being questioned. According to defendant, this procedure "prohibited the attorneys and [him] from seeing jurors' faces and reactions to questions posed to the group, or to questions posed to other jurors that a juror may have had a reaction to." Defendant also complained that the jurors were spread out and sitting as far as 50 feet away from the witness stand and video monitor and, at times, the jurors indicated that they could not hear or see certain evidence. Additionally, defendant claimed that the prosecution team was positioned closer to the judge and jury, while defendant and his team were farther away and had two corrections officers nearby. Defendant argued that this arrangement "created the illusion" that he was a danger and needed to be under constant guard.

¶ 45    At the hearing on the motion for a new trial, the court stated that the reason it denied the defense motion to continue was because of a combination of factors. The court noted, for instance, that it was defendant's trial and he "wanted to go forward." The court also said the motion to continue was premature, as it was unknown whether the COVID-19 pandemic would cause any issues at trial. With respect to questioning the potential jurors during *voir dire* about COVID-19, the court observed that it "outline[d] all the differences that *** had [been] made *** to keep [the jurors] safe" and encouraged the jurors to bring it to the court's attention if they felt unsafe. The court stated that the questions submitted by defense counsel "would have just focused everyone's attention on COVID, and that's not what the trial was about." The court said that it wanted the jurors "to feel safe and secure while they were here" and that the questions it asked "allowed for

them to express themselves *** if they felt that they were not." The court noted that not one juror brought any safety concerns to its attention or otherwise expressed any concerns about serving during the pandemic. As such, the court ruled that it adequately questioned the jurors about COVID-19. The court rejected the rest of the arguments and denied the motion for a new trial.

¶ 46    On August 12, 2020, the trial court held defendant's sentencing hearing. Ultimately, the court sentenced defendant to an extended-term sentence of 70 years on count V. This appeal followed.

¶ 47                                    II. ANALYSIS

¶ 48    On appeal, defendant raises the following issues. First, defendant argues that the trial court erred in honoring his personal demand to proceed to trial over the objection of his own attorney and "in the midst of an unprecedented global pandemic." Second, defendant argues that the trial court erred by refusing to ask potential jurors during *voir dire* certain questions tendered by his attorney designed to elicit COVID-19-related concerns and possible biases. Third, defendant argues that other COVID-19-related measures, including mandatory masking of the venire and social-distancing protocols, denied him a fair trial. Fourth, defendant argues that he was denied a fair trial where the State was permitted to introduce the preinterrogation video, which showed him cursing and acting belligerently. Fifth, defendant argues that he was denied a fair trial by the State's remarks regarding his demeanor made during closing argument. Sixth, defendant argues that he was denied a fair trial where the trial court allowed the jury to view gruesome photographs of the victim. We address each issue *seriatim*.

¶ 49                                  A. Trial Demand

¶ 50    Defendant first argues that the trial court erred in honoring his personal demand to proceed to trial over the objection of his own attorney and "in the midst of an unprecedented global

pandemic." Defendant contends that the decision whether to proceed to trial is a strategic decision that belongs uniquely to a criminal defendant's attorney and that the trial court therefore erred by allowing defendant himself to control that decision. He further asserts that, in honoring his demand to proceed to trial, the court forced his attorney to try the case in unprecedented circumstances that made it impossible for him to have a fair trial.

¶ 51     The State's response is twofold. First, the State argues that defendant is estopped from raising this claim on appeal, because he invited the alleged error in the trial court. Second, the State asserts that the trial court properly exercised its discretion when it honored defendant's personal demand to proceed to trial over defense counsel's request for a continuance. In this regard, the State asserts that, despite the uncertainties of proceeding to a jury trial during a pandemic, defense counsel failed to present a sufficient basis to continue the matter for a later trial date. The State further posits that defendant has failed to show how he was prejudiced by the trial court's decision to honor his personal demand to proceed to trial over defense counsel's objection. The State points out that, had the trial court granted a continuance to July, the matter still would have proceeded to trial during the pandemic.

¶ 52     Prior to considering the merits of defendant's argument, we must address two preliminary matters. Initially, we note that the parties dispute the applicable standard of review. Citing *People v. Kluxdal*, 225 Ill. App. 3d 217, 223 (1991), and *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 13, defendant contends that the trial court made an erroneous ruling of law and, therefore, our review is *de novo*. Citing *People v. Walker*, 232 Ill. 2d 113, 125 (2009), the State contends that the grant or denial of a continuance is a matter resting in the sound discretion of the trial court, which decision should be reviewed for an abuse of discretion. We agree with the State

that a ruling on a motion for a continuance is reviewed for an abuse of discretion.[3] *Walker*, 232 Ill. 2d at 125 ("It is well settled that the granting or denial of a continuance is a matter resting in the sound discretion of the trial court, and a reviewing court will not interfere with that decision absent a clear abuse of discretion."); see *People v. Rios*, 2022 IL App (1st) 171509, ¶ 86; *People v. Merritt*, 2017 IL App (2d) 150219, ¶ 22; *People v. Webb*, 38 Ill. App. 3d 629, 634 (1976). An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *People v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 33.

¶ 53       Second, as noted earlier, the State contends that defendant should be estopped from raising this claim on appeal, because he invited the alleged error in the trial court. The doctrine of invited error prohibits a party from requesting to proceed in one manner and then arguing on appeal that the requested action was error. *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004); *Pellico v. Mork*, 2018 IL App (2d) 170468, ¶ 20. The rationale for the doctrine is that it would be manifestly unfair to grant a party relief based on an error that the party introduced into the proceedings. *Gaffney v. Board of Trustees of the Orland Fire Protection District*, 2012 IL 110012, ¶ 33; *Pellico*, 2018 IL App (2d) 170468, ¶ 20. The State references several cases in support of its argument. In each of those cases, the defendant asked for a certain course of action through defense counsel and counsel did not object. See *People v. Harvey*, 211 Ill. 2d 368, 385-86 (2004) (holding that two of the defendants were estopped from challenging the use of the mere-fact method of impeachment where defense counsel either requested or agreed to the use of it at trial); *People v. Villarreal*, 198

---

[3] Although we apply the abuse of discretion standard of review, the result we reach would be the same under the *de novo* standard.

Ill. 2d 209, 227-28 (2001) (holding that the defendant cannot challenge the propriety of verdict forms submitted by defense counsel); *People v. Reed*, 2019 IL App (4th) 170090, ¶ 26 (holding that a defendant, after being fully admonished and while represented by counsel, cannot knowingly and voluntarily plead guilty in the trial court and subsequently complain to a reviewing court that the trial court found him or her guilty); *People v. Threatte*, 2017 IL App (2d) 160161, ¶ 18 (holding that the defense could not oppose a trial continuance due to the prosecutor's illness and then argue on appeal that the trial court should have granted a continuance); *People v. Sparks*, 314 Ill. App. 3d 268, 272 (2000) (holding that the defendant was estopped from challenging the use of the mere-fact method of impeachment where defense counsel requested the use of it at trial). In this case, it is true that defendant personally demanded trial. However, unlike the cases cited by the State, defense counsel made clear that he objected to defendant's personal demand for trial and requested a continuance instead. On appeal, defendant contends that the decision whether to file a demand for a speedy trial was a strategic matter left to defense counsel and therefore it was improper for the trial court to allow defendant to control the decision over counsel's objections. Under these circumstances, we decline the State's invitation to invoke the doctrine of invited error to find defendant estopped from raising this claim on appeal.

¶ 54    Turning to the merits, we observe that defendant's argument is premised on the concept that, in a criminal matter, only a few decisions belong to a defendant personally (after consulting with counsel), while most decisions are matters of trial tactics and strategy that belong to counsel (after consulting with the defendant). See *People v. Griffin*, 2022 IL App (1st) 190499, ¶ 19. The supreme court has recognized that a defendant has the ultimate decision-making authority with respect to (1) what plea to enter, (2) whether to waive a jury trial, (3) whether to testify on his or her own behalf, (4) whether to submit a jury instruction on a lesser included defense, and

(5) whether to appeal. *People v. Wilmington*, 2013 IL 112938, ¶¶ 45-46. In contrast, ultimate decision-making authority on matters of trial tactics and strategy belong to defense counsel. *People v. Ramey*, 152 Ill. 2d 41, 54 (1992); *Griffin*, 2022 IL App (1st) 190499, ¶ 19. These matters include decisions such as which witnesses to call, whether and how to conduct cross-examination, which jurors to accept or strike, the trial motions to be made, and what defenses should be presented at trial. *Ramey*, 152 Ill. 2d at 54; *Griffin*, 2022 IL App (1st) 190499, ¶ 19. The decision whether to demand a speedy trial has also been recognized as a matter "left to the sound strategic decision of counsel." *People v. Kaczmarek*, 207 Ill. 2d 288, 298 (2003); see *People v. Keys*, 195 Ill. App. 3d 370, 373-74 (1990) (noting that the decision not to file a demand for a speedy trial is a strategic matter left to the attorney). According to defendant, since the decision to file a demand for a speedy trial is a strategic matter left to a party's attorney, the trial court erred by honoring his demand for trial instead of deferring to counsel's request to continue the matter due to the COVID-19 pandemic.

¶ 55    As defendant acknowledges, however, in *People v. Williams*, 59 Ill. 2d 402 (1974), and *People v. Lewis*, 60 Ill. 2d 152 (1975), the supreme court addressed situations in which a criminal defendant invoked the right to a speedy trial against the advice of his attorney, who requested more time to prepare for trial. In *Williams*, the defendant was arraigned on the 119th day after his arrest for the offense of armed robbery. The public defender's office was appointed to represent him on the day of the arraignment. After speaking with the defendant, the assistant public defender informed the court that he would like some time to investigate the case and locate a particular witness. The defendant, however, demanded that trial commence. Jury selection commenced the same day—the 119th day of the 120-day speedy trial term (see Ill. Rev. Stat. 1971, ch. 38, ¶ 103-5(a)). Ultimately, the jury found the defendant guilty. On appeal to the supreme court, the

defendant argued that he was denied due process of law by being required to choose between the right to effective assistance of counsel and the right to a speedy trial. The court rejected this claim, explaining:

" 'To argue that [the defendant] was forced to choose as he did is to argue technicalities. The right to a speedy trial and the right to avoid a precipitous trial are separate but related rights. Both are designed to assure an accused a fair trial, to prevent undue delay in one instance and undue haste in the other. He can demand action or avoid action as the exigencies of his situation may dictate. But fairness and justice are not a one-way street. *** The fact that on occasion the accused might have to jeopardize the legislative benefits of the four-month rule by asserting his right to a continuance does not entail a denial of his right to a speedy trial. *** The election was [the] defendant's to determine on the basis of what would better ensure him a fair trial, and, having chosen to proceed, his present argument is nothing more than technical obfuscation.' " *Williams*, 59 Ill. 2d at 406 (quoting *People v. Johnson*, 45 Ill. 2d 38, 43-44 (1970)).

¶ 56    The *Williams* court proceeded to examine the record and found that the defendant was not denied effective assistance of counsel as a consequence of his election to proceed to trial over defense counsel's objection. *Williams*, 59 Ill. 2d at 406-08. The supreme court noted that the trial court gave defense counsel time during the course of the trial to locate witnesses and prepare his defense. Further, defense counsel informed the court that he had located some witnesses, had completed his investigation, was adequately prepared to go to trial, and was withdrawing his motion for a continuance. *Williams*, 59 Ill. 2d at 407. The supreme court also observed that at no time during the trial did the defendant or defense counsel either ask the court for a continuance for

any purpose or indicate that they were in any way unprepared to present the defense. *Williams*, 59 Ill. 2d at 408.

¶ 57 Additionally, the court rejected as conjecture any claim that more time for preparation would have permitted defense counsel to undertake a more thorough investigation where such argument assumed such an investigation would have produced other evidence favorable to the defendant. *Williams*, 59 Ill. 2d at 408. Finally, the court searched the record for evidence of prejudice to the defendant that may have resulted from the failure to grant the continuance, but it was unable to find any. *Williams*, 59 Ill. 2d at 408-09. The court noted that the trial court and the prosecutor permitted the trial to move slowly, which gave defense counsel time to investigate the offense. *Williams*, 59 Ill. 2d at 408. Further, defense counsel had copies of the grand jury minutes, a transcript of the preliminary hearing, and copies of police reports to use during cross-examination of the State's witness. *Williams*, 59 Ill. 2d at 408. The court also found that the evidence against the defendant was substantial. *Williams*, 59 Ill. 2d at 408-09. The defendant was identified from a lineup by two witnesses shortly after the offense. *Williams*, 59 Ill. 2d at 409. Following the robbery, one of the defendant's accomplices was seen getting into a car the defendant was driving, and, when the car was stopped by the police, the accomplice was seen stuffing "something" behind the rear seat. *Williams*, 59 Ill. 2d at 409. That "something" was $192 in currency and corresponded to the amount and denomination of bills taken in the robbery. *Williams*, 59 Ill. 2d at 409. As such, the court was unable to ascertain how additional preparation for trial would have benefited the defendant. *Williams*, 59 Ill. 2d at 409.

¶ 58 In *Lewis*, 60 Ill. 2d 152, the defendant was charged with armed robbery. He was arraigned on the 110th day after his arrest, and the public defender's office was appointed to represent him. The matter was set for trial on the 116th day of the 120-day speedy-trial term, and, on that date,

the assistant public defender advised the trial court he was not ready for trial due to the fact that he had been assigned to the case only six days earlier. The defendant, however, against defense counsel's advice, persisted in demanding a speedy trial and answering ready, even after the trial court made two specific inquiries into whether the defendant wished to persist in his demand despite defense counsel's representations. The trial court ordered the State to turn over to defense counsel any material that would have been tendered in discovery. The State complied. Additionally, the trial court permitted defense counsel to consult with two of the State's witnesses; permitted another assistant public defender, who had represented the defendant at a preliminary hearing, to assist during trial; and permitted the defendant to file motions to quash arrest and suppress evidence. The trial commenced the following day, the 117th day of the speedy-trial term, and the defendant was found guilty.

¶ 59    On appeal, the defendant argued that he was denied due process of law by being required to choose between his statutory right to trial within 120 days (see Ill. Rev. Stat. 1971, ch. 38, ¶ 103-5(a)) and his constitutional right to effective assistance of counsel. The supreme court rejected the defendant's argument, citing the same passage from *Johnson* that the court quoted in *Williams.* See *Lewis*, 60 Ill. 2d at 156-57 (quoting *Johnson*, 45 Ill. 2d at 43-44). The court added that the constitution does not forbid requiring a defendant to choose between these rights. *Lewis*, 60 Ill. 2d at 157.

¶ 60    Further, the court examined the record and found that the defendant was not denied effective assistance of counsel as a consequence of his election to proceed to trial over counsel's objection. *Lewis*, 60 Ill. 2d at 157-58. The court noted that the trial was relatively short and did not involve complex issues of law or fact that would require lengthy preparation by defense counsel. *Lewis*, 60 Ill. 2d at 157. Moreover, the court noted that the State had given defense counsel the

materials it would normally have given in discovery and defense counsel was permitted to consult with the State's witnesses. *Lewis*, 60 Ill. 2d at 157. The court rejected as conjecture the defendant's argument that more time for preparation would have permitted defense counsel to undertake a more thorough investigation, where such argument assumed such an investigation would have produced other evidence favorable to the defendant. *Lewis*, 60 Ill. 2d at 157-58. Additionally, the court's review of the trial transcript "conclusively show[ed] that defense counsel conducted a vigorous defense and exhibited no lack of effectiveness in representing [the] defendant at any stage of the proceedings in the trial court." *Lewis*, 60 Ill. 2d at 158.

¶ 61    Other courts have also addressed situations in which a criminal defendant has invoked the right to a speedy trial against the advice of an attorney who has requested more time to prepare for trial. In *Webb*, 38 Ill. App. 3d 629, the defendants were charged with armed robbery. Both defendants insisted on demanding an immediate trial one week after the appointment of the public defender's office. The assistant public defender advised the trial court that she was not prepared to go to trial. The trial court explained the situation to the defendants and informed them that it had discretion to grant a continuance notwithstanding their desire for immediate trial so that they could not later claim they were deprived of effective assistance of counsel. Both defendants acknowledged that they understood what the court was telling them, and both indicated that they wanted to go to trial without further delay. After additional discussion with the public defender, the defendants persisted in their trial demand. A bench trial commenced three days later, after which the defendants were found guilty. On appeal, the defendants argued that the trial court had deprived them of effective assistance of counsel by failing to grant their attorney's request for the additional time that she represented was needed for adequate presentation of their case. *Webb*, 38 Ill. App. 3d at 634. The reviewing court rejected the defendants' argument. *Webb*, 38 Ill. App. 3d

at 634. The court held that, in the situation presented, the trial court may (1) allow a continuance over the objection of the defendant, as had occurred in *People v. Carr*, 9 Ill. App. 3d 382 (1972), or (2) comply with a defendant's demand that there be no delay, as had occurred in *People v. Spencer*, 18 Ill. App. 3d 1009 (1974) (abstract). *Webb*, 38 Ill. App. 3d at 634. The reviewing court then reasoned that the trial court did not abuse its discretion in complying with the defendants' demand for trial instead of granting a continuance. *Webb*, 38 Ill. App. 3d at 634. The reviewing court further noted that the facts of the case before it were not complex and that the defendants' attorney had been able to cross-examine the State's witnesses at length and with competence and vigor, despite the short time in which she had to prepare for trial. *Webb*, 38 Ill. App. 3d at 634.

¶ 62     More recently, in *Griffin*, 2022 IL App (1st) 190499, the reviewing court addressed whether the trial court erred by honoring the defendant's personal demand for trial over the objection of defense counsel, who requested a continuance. In that case, the defendant was arraigned on May 1, 2018, at which time an assistant public defender was appointed to represent him. At a status hearing on August 9, 2018, defense counsel informed the trial court that the defendant wanted to demand trial. Defense counsel stated, however, that the defendant's request was contrary to counsel's advice and that counsel had informed the defendant that there was evidence that was not yet in counsel's possession. The court suggested that the defendant discuss the matter further with counsel and continued the case to August 27, 2018, for the completion of discovery. On that date, the State represented that all discovery had been tendered to the defense. At a status hearing on September 20, 2018, defense counsel again informed the trial court that the defendant wanted to demand trial against counsel's advice. Defense counsel stated that he was still investigating a potential occurrence witness. The court again addressed the defendant, telling him, *inter alia*, that defense counsel wanted more time to ensure that he could talk to witnesses and be

fully prepared to go to trial. In response, the defendant demanded trial, acknowledging that he was doing so against defense counsel's advice. The court then ordered the State to pick a date, over defense counsel's objection. Ultimately, the matter proceeded to a bench trial on October 3, 2018, after which the defendant was found guilty of being an armed habitual criminal and unlawful use of a weapon.

¶ 63     On appeal, the defendant argued that the trial court erred by honoring his demand for trial, because the decision whether to demand a speedy trial belongs uniquely to a criminal defendant's attorney. The defendant further contended that the trial court's error forced defense counsel to try his case unprepared and denied him a fair trial. The *Griffin* court, citing various cases, including the supreme court's decisions in *Williams* and *Lewis*, rejected the defendant's claims. *Griffin*, 2022 IL App (1st) 190499, ¶¶ 19-31. The court indicated that *Williams* and *Lewis* remain good law and

> "reflect the proper approach that a trial court may honor a criminal defendant's demand to proceed to trial against the advice of counsel or where counsel represents that additional time to prepare would be beneficial, provided that the trial court ensures that the defendant understands the consequences that such a decision could have on his or her counsel's preparedness for trial." *Griffin*, 2022 IL App (1st) 190499, ¶ 24.

Ultimately, the court concluded that the approach used by the trial court was appropriate. *Griffin*, 2022 IL App (1st) 190499, ¶ 25. The court noted, for instance, that the trial court ensured that the defendant understood the charges against him, the potential sentence he faced if convicted, the fact that defense counsel believed a continuance would be advantageous to the defendant's case, the fact that demanding trial could mean that counsel would not be as prepared to represent him as he might otherwise be, and the fact that he was persisting in this demand against counsel's advice. *Griffin*, 2022 IL App (1st) 190499, ¶ 25. Additionally, the trial court inquired of defense counsel

about the nature of the investigation he wanted to complete before proceeding to trial and recognized that the defendant's previous experience with the criminal justice system provided him with insight into the consequences of the decision to demand trial against counsel's advice. *Griffin*, 2022 IL App (1st) 190499, ¶ 25. The *Griffin* court also discussed several cases cited by the defendant in support of his claims, but it found those cases inapposite to the question of whether defense counsel, and not a defendant personally, is vested with ultimate decision-making authority about whether to demand a speedy trial. *Griffin*, 2022 IL App (1st) 190499, ¶¶ 26-30. The *Griffin* court dismissed the notion that the defendant was deprived of a fair trial by the trial court's decision to honor his request for a speedy trial. *Griffin*, 2022 IL App (1st) 190499, ¶ 31. The court noted that the case was neither factually nor legally complex. *Griffin*, 2022 IL App (1st) 190499, ¶ 31. Further, defense counsel competently and vigorously cross-examined the State's witnesses, elicited testimony on various points favorable to the defense, and presented a defense theory attacking the State's position on various points. *Griffin*, 2022 IL App (1st) 190499, ¶ 31. As such, the court concluded that any suggestion by the defendant that additional evidence favorable to him would have become available if counsel had more time to prepare for trial was nothing other than speculation and conjecture. *Griffin*, 2022 IL App (1st) 190499, ¶ 31.

¶ 64 Based on the foregoing cases, we reject defendant's argument that the trial court erred in honoring his demand for trial over defense counsel's objection. The cases above reflect that a trial court may honor a criminal defendant's demand to proceed to trial against the advice of counsel provided that the trial court ensures that the defendant understands the consequences of such a decision. See *Lewis*, 60 Ill. 2d at 156-58; *Williams*, 59 Ill. 2d at 406-09; *Griffin*, 2022 IL App (1st) 190499, ¶ 24; *Webb*, 38 Ill. App. 3d at 634. In this case, both sides indicated that, other than the COVID-19 issues, they were ready to proceed to trial. The trial court addressed defendant to ensure

that he understood the consequences of proceeding to trial, against counsel's advice, during the pandemic. The court noted, for instance, that due to social-distancing rules, trials would be conducted in only the two largest courtrooms, the jury-selection process would take longer, and the jurors would have to be spread throughout the courtroom. The court also noted that the jurors might be seated in a way that they could hear defendant's conversations with defense counsel or see defense counsel's computer screen. Additionally, the court reviewed the masking rules that would be applied to the jurors and other trial participants. The court asked defendant if he had any questions about the trial procedures. Defendant responded in the negative, stating that he did not care. The court also asked defendant whether, understanding the way in which the trial would be held, he still wanted to proceed. Defendant responded in the affirmative. In addition, at the final status hearing before the trial, the court reiterated that there would be unforeseen problems conducting a trial during the pandemic. The court also reiterated that it was defense counsel's opinion that the trial should be continued until July. The court again asked defendant, whether, understanding all of that, he still wished to go forward with the trial on June 1, 2020. Defendant again responded in the affirmative. Given this record, we conclude that the trial court did not abuse its discretion in honoring defendant's demand for trial notwithstanding defense counsel's request for a continuance.

¶ 65    Citing various cases, defendant nevertheless insists that "the decision to not file a demand for speedy trial is a strategic matter left to the attorney" and that, when a defendant's wishes clash with those of counsel, counsel's decision is dispositive. Defendant contends that such a rule prevents attorneys from being forced to litigate cases unprepared. However, there is no allegation in this case that defense counsel was unprepared to proceed to trial on June 1. To the contrary, as noted above, both sides indicated that, other than the COVID-19 issues, they were ready to proceed

to trial. And, as the State points out, while the pandemic was an issue, the pandemic would have still been an issue had the trial taken place in July or August as defense counsel requested.

¶ 66    Defendant also argues that *Lewis* and *Williams* do not "sit well with modern precedent" and "proceed from a flawed premise" that the defendant personally controls the decision to demand a speedy trial. However, defendant does not cite any authority that *Lewis* and *Williams* are no longer good law. In fact, none of the cases relied upon by defendant in support of his position specifically addresses whether counsel, and not the defendant, holds the ultimate decision-making authority with respect to a speedy-trial demand. For instance, in *Keys*, 195 Ill. App. 3d at 372, the defendant argued that counsel ignored his clear directions to file a speedy trial demand, thereby rendering ineffective assistance of counsel. The court rejected this argument, reasoning that the record did not support the defendant's view that he had instructed counsel to file a demand for a speedy trial. *Keys*, 195 Ill. App. 3d at 373. The court further held that, even if it were to find that the defendant insisted that counsel file a speedy-trial demand, the decision to file a demand for a speedy trial is a strategic matter left for counsel. *Keys*, 195 Ill. App. 3d at 373-75. As such, the court concluded that the defendant failed to show that counsel's actions fell below an objective standard of reasonableness as required to support a claim of ineffective assistance of counsel. *Keys*, 195 Ill. App. 3d at 375-76. However, saying that counsel is not ineffective for making the strategic decision not to demand a speedy trial is not the same as saying that a trial court may not honor the knowing decision of a defendant who understands the consequences and demands trial against the advice of counsel.

¶ 67    In *Carr*, 9 Ill. App. 3d 382, the reviewing court held that the trial court properly granted defense counsel's request for a continuance for additional time to prepare for trial notwithstanding the defendant's strenuous objection to the continuance. *Carr*, 9 Ill. App. 3d at 383-84. In so

holding, the reviewing court reasoned that, if "the [trial] court had acceded to [the] defendant's demands, and had [the] defendant been found guilty, the question would surely have arisen as to whether [the] defendant had been denied the effective assistance of counsel who had stated that he was not prepared to defend." *Carr*, 9 Ill. App. 3d at 384. As discussed above, the *Webb* court recognized that the approach taken in *Carr* was one of two approaches a trial court may take in circumstances where a defendant demands trial over defense counsel's objection. *Webb*, 38 Ill. App. 3d at 634. Moreover, as the *Webb* court recognized, a trial court does not abuse its discretion by complying with a defendant's demand for trial instead of granting defense counsel's request for a continuance. *Webb*, 38 Ill. App. 3d at 634.

¶ 68    In *People v. Bowman*, 138 Ill. 2d 131 (1990), the supreme court held that that the defendant failed to establish a violation of his speedy-trial rights where the trial court had granted a continuance requested by substitute defense counsel notwithstanding the defendant's later assertions that he never agreed to the continuance. *Bowman*, 138 Ill. 2d at 140-41. Our review of *Bowman*, however, finds no support for the proposition that a trial court must always defer to defense counsel's request for a continuance over a defendant's demand for trial.

¶ 69    In *Kaczmarek*, 207 Ill. 2d 288, the issue was whether the defendant's right to a speedy trial had been violated by the fact that his case had been continued for nearly 3½ years between the issuance of the appellate court's mandate remanding his case for a new trial and the retrial itself. During that time, the defendant had been represented by six different attorneys and the case had been continued 39 times by agreement of both parties, 3 times by order of the court, and 3 times on motions by the defendant's attorneys. As part of its analysis of the factors bearing on whether a constitutional violation had occurred, the court looked to whether the defendant had asserted his right to a speedy trial. *Kaczmarek*, 207 Ill. 2d at 297. The court noted that the defendant had

attempted to assert his right to a speedy trial against the wishes of his attorneys, who were not prepared to proceed to trial. *Kaczmarek*, 207 Ill. 2d at 297-98. On each of these occasions, however, the record showed that the defendant had either acquiesced to continuances requested by his attorneys or had failed to obtain a ruling from the trial court on *pro se* motions demanding immediate trial. *Kaczmarek*, 207 Ill. 2d at 298-99. As the record indicated that the defendant wanted the assistance of counsel in preparing his defense for trial, he was bound by his attorneys' actions in requesting or agreeing to continuances. *Kaczmarek*, 207 Ill. 2d at 299.

¶ 70    We find the discussion in *Kaczmarek* to be inapposite to the argument presented by defendant in this appeal. The legal issue before the court in *Kaczmarek* was not the propriety of honoring a defendant's demand for speedy trial made against an attorney's advice. It is evident that the defendant in *Kaczmarek* did not make an unequivocal demand that his case proceed immediately to retrial. Rather, the defendant either agreed to the continuances or failed to press the trial court to rule on his *pro se* motions for immediate trial. Nothing in *Kaczmarek* suggests that a trial court must always grant an attorney's request for a continuance in the face of a defendant demanding immediate trial or that a trial court lacks the discretion to honor a defendant's knowing demand for immediate trial if made against an attorney's advice. Indeed, the *Kaczmarek* court recognized that the constitution does not forbid requiring a defendant to choose between a speedy trial and effective assistance of counsel. *Kaczmarek*, 207 Ill. 2d at 298 (citing *Bowman*, 138 Ill. 2d at 148). Thus, *Kaczmarek* lends further support to our conclusion that the trial court in this case did not err by honoring defendant's demand to proceed to trial.

¶ 71    In short, the cases relied upon by defendant are inapposite to the question of whether defense counsel, and not a defendant personally, is vested with ultimate decision-making authority about whether to demand a speedy trial. Accordingly, we conclude that the trial court did not abuse

its discretion in honoring defendant's knowing demand for immediate trial notwithstanding defense counsel's advice to the contrary.

¶ 72                                  B. *Voir Dire*

¶ 73     Next, defendant argues that the trial court committed reversible error by failing to adequately question potential jurors during *voir dire* about serving on a jury during the COVID-19 pandemic. Defendant acknowledges that the trial court permitted the parties to submit proposed COVID-19-related *voir dire* questions, but he claims that the trial court ignored defense counsel's proposed questions and asked only generally if the potential jurors had "concerns" about the pandemic or would have difficulty concentrating. The State responds that the trial court adequately questioned the potential jurors about various pandemic concerns and provided them with an opportunity to raise any concerns they may have had. As such, the State contends that defendant's claim lacks merit.

¶ 74     "A criminal defendant has a constitutional right to trial by an impartial jury." *People v. Encalado*, 2018 IL 122059, ¶ 24. "To secure this right, inquiry is permitted during *voir dire* ' "to ascertain whether the juror has any bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." ' " *Encalado*, 2018 IL 122059, ¶ 24 (quoting *People v. Lobb*, 17 Ill. 2d 287, 300 (1959), quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). " 'The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.' " *Encalado*, 2018 IL 122059, ¶ 24 (quoting *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993)); see *People v. Martinez*, 297 Ill. App. 3d 328, 339 (1998) (noting that one of the purposes of *voir dire* is to observe the demeanor of the prospective jurors). "Jurors 'must harbor no bias or

- 44 -

prejudice which would prevent them from returning a verdict according to the law and evidence.' " *Encalado*, 2018 IL 122059, ¶ 24 (quoting *People v. Strain*, 194 Ill. 2d 467, 476 (2000)).

¶ 75    Illinois Supreme Court Rule 431(a) (eff. July 1, 2012) provides that the trial court

> "may permit the parties to submit additional questions to it for further inquiry if it thinks
>
> they are appropriate and shall permit the parties to supplement the examination by such
>
> direct inquiry as the court deems proper for a reasonable period of time depending upon
>
> the length of examination by the court, the complexity of the case, and the nature of the
>
> charges."

The manner, extent, and scope of *voir dire* rests within the sound discretion of the trial court. *Encalado*, 2018 IL 122059, ¶ 25. "However, 'the trial court must exercise its discretion in a manner consistent with the purpose of *voir dire*.' " *Encalado*, 2018 IL 122059, ¶ 25 (quoting *Strain*, 194 Ill. 2d at 476). In the context of the issue presented, the trial court abuses its discretion only if it prevents the selection of a jury capable of "returning a verdict according to the law and evidence" without bias or prejudice. *Strain*, 194 Ill. 2d at 476.

¶ 76    We conclude that the trial court adequately questioned prospective jurors during *voir dire* about serving on a jury during the COVID-19 pandemic. The court told the prospective jurors that holding a trial during the pandemic would be different. The court explained the COVID-19 safety precautions that had been implemented at the courthouse, including changes to the layout of the courtroom, social distancing rules, mask requirements, and the cleaning protocol. The court also told the prospective jurors to alert the bailiffs if they felt unsafe about any of the safety precautions. The court then specifically asked the prospective jurors if they had any concerns about serving as a juror during the pandemic. No prospective juror raised his or her hand. Furthermore, at no time during the course of the trial did any juror alert the bailiffs that he or she felt unsafe or unsure

about any of the safety precautions that had been implemented. Moreover, in denying defendant's motion for a new trial, the court explained why it conducted *voir dire* without asking verbatim the questions proposed by defense counsel. The court stated that the questions submitted by defense counsel "would have just focused everyone's attention on COVID, and that's not what the trial was about." The court elaborated that it "wanted people to feel safe and secure while they were here" and that "the questions that [it] asked allowed for [the jurors] to express themselves, if they felt that they were not [safe and secure]." Given this record, we conclude that the trial court struck a reasonable balance between allowing the jurors to express any concerns about the pandemic and ensuring that the pandemic did not become the focus of *voir dire*. As such, the trial court's questioning did not prevent the selection of a jury capable of returning a verdict according to the law and evidence without bias or prejudice. *Strain*, 194 Ill. 2d at 476. We thus find no abuse of discretion.

¶ 77    Defendant asserts that this case is comparable to *Strain*, 194 Ill. 2d 467. In that case, the defendant was charged with first-degree murder. The State's theory was that the defendant, a gang member, shot the victim while attempting to retaliate against a rival gang for allegedly shooting the defendant in the leg on an earlier occasion. Prior to the start of *voir dire*, the trial court stated that it would ask prospective jurors about their involvement, if any, with gangs. The trial court also indicated that, pursuant to Illinois Supreme Court Rule 431 (eff. July 1, 2012), it would allow supplemental questions of prospective jurors upon the court's approval of the questions. During *voir dire*, the trial court asked potential jurors if they, any member of their family, or a close friend had any involvement with a gang. The court also asked each prospective juror whether he or she could be fair to both sides. However, the court refused defense counsel's request to ask each prospective juror whether the juror would find the defendant less believable if the juror learned

that the defendant belonged to a gang. During trial, gang members testified, a statement made by the defendant to the police concerning the gang-related motive for the shooting was admitted into evidence, and the defendant testified, denying that he made the statement to police. Moreover, the trial court allowed the State to introduce evidence at trial of other gang-related crimes. The defendant was ultimately found guilty. At issue on direct appeal was whether the trial court committed error in refusing to ask the venire the questions submitted by the defendant, which sought to expose juror predisposition toward, and bias against, gangs. The appellate court reversed the defendant's conviction, concluding that the trial court's refusal to ask defense counsel's proffered questions denied the defendant a fundamentally fair *voir dire* proceeding. *People v. Strain*, 306 Ill. App. 3d 328, 338-39 (1999).

¶ 78    In affirming the judgment of the appellate court, the supreme court noted that gang information permeated the testimony of almost every witness at trial and that the outcome of the trial turned upon the credibility of the defendant and the testifying police officers and rival gang members. *Strain*, 194 Ill. 2d at 473. The court also recognized that "street gangs are regarded with considerable disfavor by other segments of our society" and that, unless there is sufficient proof that membership or activity in a gang relates to the crime charged, evidence that a defendant is a gang member is generally excluded because of its prejudicial effect. *Strain*, 194 Ill. 2d at 477. The court then stated that

> "[t]he same concerns regarding the prejudicial effect of gang evidence dictate our holding
> that, when testimony regarding gang membership and gang-related activity is to be an
> integral part of the defendant's trial, the defendant must be afforded an opportunity to
> question the prospective jurors, either directly or through questions submitted to the trial
> court, concerning gang bias." *Strain*, 194 Ill. 2d at 477.

Given this holding, and based on the record before it, the supreme court concluded that the trial court's refusal to ask prospective jurors the gang-bias questions submitted by defense counsel during *voir dire* denied the defendant an informed and intelligent basis upon which to assert challenges for cause or to exercise peremptory challenges. *Strain*, 194 Ill. 2d at 481. As such, the supreme court affirmed the judgment of the appellate court reversing the defendant's conviction and remanding the matter for a new trial. *Strain*, 194 Ill. 2d at 481.

¶ 79    Defendant argues that COVID-19 provokes similarly strong feelings as gang membership. However, we find defendant's reliance on *Strain* misplaced for multiple reasons. First, Illinois courts have declined to extend *Strain* and have not required trial courts to mandate *voir dire* questioning on other issues. See *Encalado*, 2018 IL 122059, ¶¶ 28-33 (prostitution); *People v. James*, 2017 IL App (1st) 143036, ¶¶ 39-40 (gun-related matters); *People v. Anderson*, 407 Ill. App. 3d 662, 682 (2011) (prior convictions); *People v. Dixon*, 382 Ill. App. 3d 233, 245 (2008) (drug addiction and abuse). Second, and more significantly, unlike the gang activity that was at issue in the *Strain* defendant's trial, COVID-19 did not constitute an "integral part" of the State's case against defendant. Indeed, it played no evidentiary role at all. Defendant acknowledges that *Strain* is distinguishable on this basis. He insists, however, that "the specter of the virus hung over the courtroom proceedings and [he] was entitled to learn exactly how the virus would influence jurors' behavior and possibly their impartiality." As we discussed above, however, the trial court adequately questioned the prospective jurors about their COVID-19 concerns and provided them with an opportunity to raise any concerns they may have had about serving on a jury during the pandemic. Accordingly, we reject defendant's claim that the trial court committed reversible error in declining to ask potential jurors during *voir dire* defense counsel's proposed questions related to COVID-19 verbatim.

¶ 80                              C. COVID-19-Related Measures

¶ 81    Next, defendant argues that two other COVID-19-related measures denied him a fair trial.

We address each contention separately.

¶ 82                              1. Masks during *Voir Dire*

¶ 83    Defendant complains that his right to a fair trial under the sixth amendment of the United

States Constitution was violated because the potential jurors wore opaque face masks throughout

much of *voir dire*, including when they were being personally questioned and while their fellow

venire members were being questioned. Defendant complains that this practice hindered trial

counsel's ability to read a potential juror's facial expressions and detect whether he or she would

be impartial in deciding his case.

¶ 84    The State responds that defendant failed to preserve this issue for review, because he did

not raise a contemporaneous objection regarding masks during *voir dire*. Forfeiture aside, the State

contends that requiring the potential jurors to wear masks during *voir dire* was one of the

reasonable safety measures the trial court employed to keep everyone in the courtroom safe.

Therefore, the State reasons, the practice did not deprive defendant of a fair trial.

¶ 85    To preserve an issue on appeal, a defendant must both object to the purported error at trial

and include it in a written posttrial motion. *People v. Glasper*, 234 Ill. 2d 173, 203 (2009); *People

v. Hauck*, 2022 IL App (2d) 191111, ¶ 32. This rule exists to encourage a defendant to raise an

issue in the trial court, thereby ensuring both that the trial court has an opportunity to correct any

errors prior to appeal and that a defendant does not obtain reversal through his or her own inaction.

*People v. Denson*, 2014 IL 116231, ¶ 13; *Hauck*, 2022 IL App (2d) 191111, ¶ 32. In this case,

defendant acknowledges that defense counsel did not raise a contemporaneous objection regarding

masks with respect to the first group of potential jurors. He claims, however, that counsel did

object "at the first possible moment." See *Strain*, 194 Ill. 2d at 475 (noting that, generally, a party does not waive an issue if raised at the first opportunity). He also notes that counsel raised this issue in a posttrial motion. Given this record, defendant insists that the issue has not been forfeited. However, even if defendant properly preserved this issue for review, we determine that he failed to establish a deprivation of his right to an impartial trial.

¶ 86    The sixth amendment to the United States Constitution provides in pertinent part that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const., amend. VI. This right was made applicable to the states through the due process clause of the fourteenth amendment (U.S. Const., amend. XIV). *People v. Crane*, 195 Ill. 2d 42, 46 (2001); *People v. O'Quinn*, 339 Ill. App. 3d 347, 353 (2003). The United States Supreme Court has stated that "[v]*oir dire* plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored" because

> "[w]ithout ***adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. [Citation.] Similarly, lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges ***." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981).

Defendant contends that his right to an impartial jury under the sixth amendment was violated because the potential jurors wore opaque masks throughout much of *voir dire*, thereby preventing defense counsel from reading facial expressions and detecting potential bias. Defendant does not cite any authority to suggest that the entirety of a juror's face must be visible at all times during *voir dire*. To the contrary, the several courts that have addressed the issue have observed that while

masks obscure observation of two witness traits—nose and mouth movements—the parties have access to other tools to assess the demeanor and bias of potential jurors. Thus, in *United States v. Crittenden*, No. 4:20-CR-7, 2020 WL 4917733, at *7-8 (M.D. Ga. Aug. 21, 2020), the court explained that the ability to see a juror's nose and mouth is not essential to assessing a juror's bias. The court observed that demeanor "consists of more than those two body parts" and "includes the language of the entire body." *Crittenden*, 2020 WL 4917733, at *7-8; see also *United States v. Schwartz*, No. 19-20451, 2021 WL 5283948, at *2-3 (E.D. Mich. Nov. 12, 2021) (recognizing that, while a masking requirement "may create some practical challenges," a defendant still has multiple means of assessing juror bias); *United States v. Watkins*, No. 18-CR-32-A, 2021 WL 3732298, at *7 (W.D. N.Y. Aug 24, 2021) ("The defendant and his counsel were able to observe and assess prospective jurors' body language and voices during voir dire."); *Commonwealth v. Delmonico*, 251 A.3d 829, 839-42 (Pa. Super. Ct. 2021) ("There is no indication the trial court was unable to adequately view the prospective jurors, examine their conduct, or perceive any factors indicating an 'unsettled frame of mind.' "); *United States v. Tagliaferro*, 531 F. Supp. 3d 844, 851 (S.D.N.Y. 2021) (noting that demeanor consists of more than a juror's nose and mouth, it includes the language of the entire body); *United States v. James*, No. CR-19-08019-001-PCT-DLR, 2020 WL 6081501, at *3 (D. Ariz. Oct. 15, 2020) (noting that demeanor includes various aspects of body language and tone, which counsel may readily assess, and that juror questionnaires and *voir dire* also assist in detecting bias); *United States v. Trimarco*, No. 17-CR-583, 2020 WL 5211051, at *5 (E.D.N.Y. Sept. 1, 2020) (noting that, even if the defendant's attorneys cannot see the jurors' noses and mouths, all potential jurors will complete informative questionnaires and must respond to questioning during *voir dire*).

¶ 87     We agree with the foregoing authorities. That is, the ability to see a juror's nose and mouth is not essential to assess bias, because demeanor includes various aspects of body language. To the extent that the potential jurors' mouths and noses were obscured by opaque masks during *voir dire*, defendant and his attorney were still able to see the potential jurors' eyes, eyebrows, and forehead; listen to each potential juror's tone of voice; and observe each potential juror's manner of speech and other mannerisms. For instance, defendant and his attorney (as well as the State and the trial court) were able to see if the potential jurors blinked, rolled their eyes, tilted their heads, shifted, squirmed, or otherwise moved while being questioned and while other potential jurors were being questioned. Further, the parties were able to assess each potential juror's tone of voice and whether he or she made any unusual pauses during questioning. Moreover, the record establishes that the jurors in this case completed a questionnaire and the parties were given the opportunity to question potential jurors during the *voir dire* process. These tools provided defendant and his attorney additional information to detect potential bias. As the *Crittenden* court recognized, while "being able to see a potential juror's full facial expressions may be tactically preferable," the covering of the nose and mouth does not significantly hinder the observation during *voir dire* of the potential jurors' demeanor. *Crittenden*, 2020 WL 4917733, at *8. We therefore conclude that requiring the potential jurors in this case to wear opaque masks during *voir dire* did not infringe on defendant's right to an impartial jury. See *People v. Smart*, 2022 IL App (2d) 210531, ¶¶ 32-41 (holding that the defendant was not denied his right to a fair trial where the jurors were required to wear face masks during *voir dire*).

¶ 88     Defendant notes, however, that, in other contexts, courts have found that a witness wearing a mask or a defendant and his or her attorney being unable to see a witness's face violated the right to confrontation, as it foreclosed the trier of fact's opportunity to adequately assess the witness's

credibility through the observation of demeanor. See *People v. Sammons*, 478 N.W.2d 901, 906-09 (Mich. Ct. App. 1991) (holding that the trial court violated the defendant's sixth amendment right to confrontation by allowing the prosecution's chief witness to testify while wearing a ski mask that covered his face and head); *Bowser v. State*, 205 P.3d 1018, 1021-24 (Wyo. 2009) (holding that the defendant was denied his sixth amendment right to confrontation by a seating arrangement that obstructed the defendant's view of the victim during her testimony at a videotaped deposition); *United States v. Walker*, 772 F.2d 1172, 1179 (5th Cir. 1985) (" 'The facial expressions of a witness may convey much more to the trier of facts than do the spoken words.' " (quoting *United States v. Irvin*, 450 F.2d 968, 971 (9th Cir. 1971) (Kilkenny, J., dissenting))). Unlike the confrontation clause issue with masked or otherwise obscured witnesses, we are unaware of any authority—and defendant has not cited any—holding that the sixth amendment right to an impartial jury or due process demands that a defendant have unimpeded visual access to prospective jurors' facial expressions during jury selection. As explained above, we believe that a defendant's ability to ask questions during *voir dire,* see the upper half of prospective jurors' faces, assess the jurors' tones, observe other aspects of the prospective jurors' body language, question the prospective jurors, and review the prospective jurors' questionnaires is sufficient to satisfy his or her constitutional rights during jury selection. Thus, we reject this argument.

¶ 89                    2. Social Distancing and Juror Attentiveness

¶ 90    Defendant also complains that, due to social distancing requirements, the jurors were spread throughout the courtroom, resulting in several jurors indicating that they were unable to hear witnesses or see evidence being presented. According to defendant, because the trial court failed to question these jurors to determine the evidence they missed or if they were able to

participate in deliberations fairly and impartially, the jury's verdict was unworthy of confidence and resulted in an unfair trial.

¶ 91    The State responds that defendant's position is belied by the record. The State asserts that the record demonstrates that the trial court took careful measures to ensure that all of the jurors could hear the witnesses and view the exhibits.

¶ 92    As noted above, a defendant has a constitutional right to be tried by a fair and impartial jury and to due process. U.S. Const., amends. VI, XIV. A juror who is inattentive for a "substantial portion of a trial" has been found to be unqualified to serve on the jury. *People v. Jones*, 369 Ill. App. 3d 452, 455 (2006) (collecting cases); see also *Samad v. United States*, 812 A.2d 226, 230 (D.C. 2002) (holding that a brief, nonprejudicial lapse in attention may be excused, but prolonged inattentiveness in a criminal trial jeopardizes a defendant's right to a fair trial). The party claiming error from an inattentive juror must demonstrate that the juror " 'failed to follow some important or essential part of the proceeding.' " (Internal quotation marks omitted) *People v. Gonzalez*, 388 Ill. App. 3d 566, 576 (2008) (quoting *United States v. Tierney*, 947 F.2d 854, 868 (8th Cir. 1991)). When faced with possible juror inattentiveness, it is within the sound discretion of the trial court whether to reopen *voir dire*. *Jones*, 369 Ill. App. 3d at 455. We review the trial court's actions for an abuse of discretion. *Jones*, 369 Ill. App. 3d at 455. An abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view. *People v. Baez*, 241 Ill. 2d 44, 106 (2011).

¶ 93    The record shows that, shortly after the jury was sworn and prior to any testimony or evidence being presented, the trial court instructed the jury in pertinent part as follows:

> "If at any time during the trial you are unable to hear a witness or attorney or if you're unable to see a chart or any other exhibit, please let me know by raising your hand,

get my attention, get the bailiffs' attention. It's important that you have an opportunity to see all of the evidence in the case when it's being presented to you; so don't be afraid to let me know."

At trial, several jurors heeded the court's instruction. For instance, during Dr. Peters's testimony, the trial court remarked that "[s]ometimes when the parties get close, their voices drop." The court then asked the jurors if they were still able to hear Dr. Peters. Shortly later, the court noted that a juror asked that Dr. Peters keep his voice a little louder. Dr. Peters agreed to do so. Subsequently, during a break, and outside the presence of the jurors, the court informed the parties that a juror had indicated that he was "having a hard time hearing with some of the witnesses." The court informed the parties that it would be moving the juror "up to the front and putting the younger ears further back, so—to make sure he can hear and see things." Further, while the ERI was being played, a juror raised his hand and asked the court to turn up the volume on the video.

¶ 94    Citing the aforementioned episodes, defendant maintains that he was deprived of a fair trial because multiple jurors missed material testimony that bore on his guilt or innocence and the trial court failed to inquire of the jurors what or how much evidence they missed or if they were able to participate in deliberations fairly and impartially. Based on the record before us, however, we conclude that defendant has failed to meet his burden of establishing that the manner in which the trial court handled these occurrences constituted an abuse of discretion. Notably, defendant has not shown that any of the jurors were inattentive for a "substantial portion of a trial" (*Jones*, 369 Ill. App. 3d at 455) or that they " 'failed to follow some important or essential part of the proceeding' " (internal quotation marks omitted) (*Gonzalez*, 388 Ill. App. 3d at 576 (quoting *Tierney*, 947 F.2d at 868)). Significantly, the fact that, in a few isolated instances, some jurors expressed difficulty hearing does not establish that they actually missed any evidence. Instead, the

record demonstrates that the jurors were doing exactly what the trial court instructed them to do at the beginning of the trial—alert the court if they were unable to hear the trial participants. Moreover, in each instance, the trial court implemented a remedy, such as having Dr. Peters speak louder, moving a juror to a different location in the courtroom, or adjusting the volume on the video.

¶ 95    Additionally, defendant has not demonstrated that any of the jurors were unable to see the evidence presented. Although during Detective Kohanyi's testimony the trial court voiced concern that the jurors may not be able to see certain exhibits because they were being viewed from a distance, none of the jurors actually articulated that they were unable to see the exhibits. Moreover, to the extent there was any difficulty viewing the exhibits, the court implemented a two-pronged remedy—the court placed two additional chairs "into the well," so the alternate jurors could get a better view of the exhibits and, with the permission of the attorneys, informed the jurors that they would have a chance to see the exhibits up close because they would be sent back during deliberations. Consequently, all of the jurors had an opportunity to view the exhibits.

¶ 96    Defendant contends that this case is analogous to *Jones*, 369 Ill. App. 3d 452. In that case, after the State had rested and outside the presence of the jury, defense counsel objected to a comment made by the prosecutor. While discussing the matter, the trial court informed the parties that one of the jurors was " 'half asleep during almost the entire proceeding.' " *Jones*, 369 Ill. App. 3d at 453. The court told the parties that, if a juror appears to be asleep, they should bring it to the court's attention. The court took no further action on the matter. Following closing arguments, the jury returned a verdict of guilty. On appeal, the defendant argued that he was denied a fair trial because a juror had "slept through the trial" and neither the trial court nor his trial attorney took remedial action. Unable to find any Illinois cases addressing whether a trial court has an affirmative

duty to ensure an attentive jury, the *Jones* court noted that courts from other jurisdictions have held that a juror who is inattentive for "a substantial portion of a trial" has been found to be unqualified to serve on a jury. *Jones*, 369 Ill. App. 3d at 455-56 (collecting cases). Under the facts of the case, where the trial court stated on the record that a juror appeared to have been half asleep through most of the trial, the *Jones* court held that "the trial court, on its own motion, must make further inquiry to ensure that the defendant receives a fair trial. *Jones*, 369 Ill. App. 3d at 456. Therefore, the *Jones* court concluded, the trial court's failure to reopen *voir dire* constituted an abuse of its discretion. *Jones*, 369 Ill. App. 3d at 456.

¶ 97    Defendant suggests that the facts in his case are similar to those in *Jones* and that the trial court therefore had a duty to at least inquire whether any juror may have missed any crucial evidence. After reviewing the record, however, we do not believe that the facts of this case are analogous to *Jones*. As noted above, the fact that, in a few isolated instances, some jurors expressed difficulty hearing does not establish that they actually missed any evidence. Further, none of the jurors actually articulated that they were unable to see the exhibits. Accordingly, defendant's reliance on *Jones* is misplaced.

¶ 98    In short, defendant has failed to demonstrate that any of the jurors at issue were unable to hear a substantial portion of the trial or that they failed to follow some important or essential part of the proceeding. As such, we reject his argument that he was denied a fair trial on this basis.

¶ 99                                      D. Preinterrogation Video

¶ 100   Next, defendant argues that he was denied a fair trial because the State was permitted to introduce into evidence and play for the jury "an irrelevant, pre-interrogation video of [him] cursing and acting belligerently."

¶ 101   The State responds that defendant failed to preserve this issue for review. Forfeiture notwithstanding, the State asserts that the trial court properly admitted the preinterrogation video, because it was relevant evidence of defendant's demeanor shortly after the commission of the offense and it exposed inconsistencies between defendant's statements on the preinterrogation video and his statements to the police in the ERI.

¶ 102   Initially, we agree with the State that defendant failed to preserve this issue for review. As noted earlier, to preserve an issue for appeal, a defendant must both object to the purported error at trial and include it in a written posttrial motion. *Glasper*, 234 Ill. 2d at 203; *Hauck*, 2022 IL App (2d) 191111, ¶ 32. In this case, defendant acknowledges that, although defense counsel filed a motion *in limine* objecting to the admission of the preinterrogation video, he did not challenge it in a posttrial motion. As such,  defendant has forfeited his claims related to the preinterrogation video. Defendant requests, however, that we address this issue under the plain-error doctrine or as a claim of ineffective assistance of counsel.

¶ 103                                    1. Plain Error

¶ 104   Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) creates an exception to the forfeiture rule by allowing courts of review to notice "[p]lain errors or defects affecting substantial rights," even if they were not brought to the attention of the trial court. The plain-error rule is a limited and narrow exception to the forfeiture rule. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). A reviewing court may consider a forfeited issue under the plain-error rule when "the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence" or when "a clear or obvious error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *People v. Jackson*, 2022 IL 127256, ¶ 19. As the supreme court explained, the closely-balanced-evidence prong of the plain-

error rule "guards against errors that could lead to the conviction of an innocent person," while the substantial-rights prong "guards against errors that erode the integrity of the judicial process and undermine the fairness of the defendant's trial." *People v. Herron*, 215 Ill. 2d 167, 186 (2005). In plain-error review, the burden of persuasion rests with the defendant. *Jackson*, 2022 IL 127256, ¶ 19. Prior to determining whether plain error occurred, however, we must first determine whether any error occurred at all. *People v. Williams*, 2022 IL 126918, ¶ 49. If clear or obvious error did not occur, no plain-error analysis is necessary. *People v. Wright*, 2017 IL 119561, ¶ 87; *Walker*, 232 Ill. 2d at 124-25.

¶ 105   Defense counsel filed a written motion *in limine* to bar admission of the preinterrogation video, the circumstances of which were set out earlier. The trial court denied defendant's motion. The court reasoned that the preinterrogation video was relevant to expose any inconsistencies between statements defendant made on the pre-interrogation video and statements he made to police during the ERI and as evidence of defendant's demeanor.

¶ 106   Defendant argues that the trial court erred in admitting the preinterrogation video and, that as such, he deserves a new trial. According to defendant, the video was irrelevant, as his "admittedly poor immediate post-detention behavior" did not make it more likely that he murdered Randolph. Defendant contends that the video does not show him confessing or implicating himself in Randolph's death. Further, defendant denies making any statements in the video that contradict statements he made during the ERI. Defendant claims that the true reason the State wanted to show the jury the video was as propensity evidence. Additionally, defendant contends that the trial court failed to weigh the risk of unfair prejudice the video presented against its probative value.

¶ 107   The State responds that the trial court properly admitted the preinterrogation video because it was relevant to his demeanor and because defendant's statements therein were inconsistent with statements he later made in the ERI.

¶ 108   All relevant evidence is admissible, except as otherwise provided by law. Ill. R. Evid. 402 (eff. Jan. 1, 2011); *People v. McBride*, 2020 IL App (2d) 170873, ¶ 30. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 72. However, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Evidentiary rulings are within the trial court's sound discretion and will not be reversed on appeal unless the trial court has abused that discretion. *People v. Reid*, 179 Ill. 2d 297, 313 (1997). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable, or if no reasonable person would agree with the position adopted by the trial court. *People v. Illgen*, 145 Ill. 2d 353, 364 (1991).

¶ 109   The State's theory of the case was that defendant brutally and repeatedly beat Randolph with a wooden stick, causing his death, and that, despite maintaining his innocence, the truth was shown through inconsistencies at his interrogation. Defendant denied committing the crime, arguing that he merely stumbled onto the crime scene while drunk after returning home from a party and that the relatively small amount of blood on his clothes was inconsistent with the clothing of someone who had violently bludgeoned a man to death. We conclude that the preinterrogation video provided context for the State's theory of the case. Significantly, as the trial court found, the

preinterrogation video was relevant for the jury to assess the State's claim that defendant made inconsistent statements regarding what happened on the night of Randolph's death. We note, for instance, that in the preinterrogation video, defendant claimed that he did not know "what the f*** happened." Defendant explained that, when he returned home from the party, he "damn near tripped over [Randolph] going to the bathroom" and that some unidentified individual "did something to [his] best friend." During the ERI, defendant initially denied knowing anything about the murder. However, defendant later told the police that he thought someone named "Rick" killed Randolph. He subsequently stated that he was at the house with Randolph and Rick and that he observed the two men engage in a physical altercation. Defendant further stated that he saw Rick hit Randolph with a piece of wood while Randolph was on the floor. Thus, the preinterrogation video assisted the jury in assessing defendant's claim that he played no role in Randolph's death.

¶ 110 Defendant nevertheless insists that the real reason the State sought to introduce the preinterrogation video was as propensity evidence to argue that "the angry, cursing [defendant] on the video must have beaten [Randolph] in similar spasm of rage [*sic*]." Defendant notes that evidence of other crimes, wrongs, or acts is generally inadmissible if the purpose of such evidence is merely to show that the person has a bad character and to suggest that the person must have therefore behaved badly relative to the charged offense. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" except as provided by certain provisions of the Code of Criminal Procedure of 1963 (725 ILCS 5/100-1 *et seq.* (West 2018))); *People v. Jones*, 2020 IL App (4th) 190909, ¶ 142 (noting that evidence that a defendant has committed a crime other than the one for which he or she is on trial is generally not admissible for the purpose of demonstrating a propensity to commit crimes). The State responds that defendant's argument is misplaced

because the preinterrogation video does not show defendant engaged in any "misconduct" or "criminal acts." See *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 35 (noting that the term "other-crimes evidence" refers to misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which the defendant is on trial). While the preinterrogation video does not show defendant engaging in any crimes, it does show him being belligerent and cursing, which arguably would constitute "acts" within the meaning of Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). See Black's Law Dictionary (11th ed. 2019) (defining "act" as "[s]omething done or performed").

¶ 111   Defendant also contends that, to the extent evidence is relevant, the trial court may still exclude it if the prejudicial effect of the evidence outweighs its probative value. See *People v. Lewis*, 165 Ill. 2d 305, 329 (1995). Defendant complains that, in this case, the trial court did not analyze the risk of unfair prejudice presented by the preinterrogation video. The State does not respond to defendant's argument on this point.

¶ 112   However, even if the admission of the preinterrogation video was improper because it was inadmissible propensity evidence (as defendant claims) or the trial court failed to analyze whether the video's prejudicial effect outweighed its probative value, defendant cannot satisfy either prong of the plain-error rule.

¶ 113   Defendant is not entitled to relief under the first prong of the plain-error rule because the evidence in this case was not "so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." To determine whether the evidence was closely balanced, "a reviewing court must review the entire record and conduct a 'qualitative, commonsense assessment' of any evidence regarding the elements of the charged offense or offenses, as well as any evidence regarding the witnesses' credibility." *Williams*, 2022 IL 126918, ¶ 58 (quoting

*People v. Sebby*, 2017 IL 119445, ¶ 53). An error is prejudicial under the first prong of the plain-error rule where the error's impact on the outcome was "potentially dispositive." *Sebby*, 2017 IL 119445, ¶ 68.

¶ 114   Defendant was charged with various counts of first-degree murder. First-degree murder occurs when a person kills another individual without lawful justification and, as charged here, either (1) intends to kill or do great bodily harm to that individual or another or (2) knows that such acts create a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/9-1(a) (West 2018). The indictment also alleged that defendant committed the offense against a person 60 years of age or older at the time of the offense, that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, and that defendant had attained the age of 18 or more at the time of the offense. See 720 ILCS 5/9-1(b)(16) (West 2018). The State provided ample evidence regarding these elements.

¶ 115   In this regard, the evidence established that defendant and Randolph were roommates. They lived together in a house at 621 Alliance Avenue. In the early morning hours of April 7, 2019, defendant called 911 from his brother's house, which was only a few blocks away from where defendant and Randolph lived. Defendant told the 911 dispatcher that his roommate was lying in a pool of blood and he believed he was dead. When the police arrived at the Alliance residence, they met defendant and subsequently found Randolph. Randolph was lying in a pool of blood with his head severely injured. There was blood spatter around Randolph. Randolph's autopsy revealed that he had sustained multiple lacerations, abrasions, and contusions on his face and scalp. Randolph also had skull fractures, facial bone fractures, brain lacerations, and hemorrhage to the brain. The injuries to the forehead area were caused by multiple blows all in the

same spot overlapping each other. Dr. Peters determined that Randolph died of blunt force trauma to the head and that the manner of death was homicide.

¶ 116   During the investigation, the police located a wooden stick under the bushes in front of the Alliance residence. The stick measured about 40 inches in length. It was tapered and had some carvings and metal studs on it. The stick had red smears on it that appeared to be blood. Testing indicated that blood taken from the stick matched Randolph's DNA. Moreover, the police observed what appeared to be blood spatter on defendant's clothes and scratches on one of his arms. Testing indicated that swabs of blood collected from defendant's pants, shirt, and jacket were consistent with Randolph's DNA. In addition, the police recovered a pair of blue shoes from inside defendant's bedroom. A swab of blood taken from the shoes was also consistent with Randolph's DNA. The State also presented evidence that defendant was over 18 years of age and Randolph was over 60 years of age at the time of the offense.

¶ 117   Although defendant suggested that someone named "Rick" committed the murder and that the blood spatter on his clothing was more consistent with someone walking in on the murder instead of being the person who committed it, defendant offered no support for his theory. Indeed, defendant provided inconsistent statements about this theory during the ERI at the police station. Defendant initially stated that, when he returned from the party, Randolph was on the floor, he did not touch Randolph, and he did not know who did it. Later, he told officers that it was possible that someone named "Rick" killed Randolph. Subsequently, defendant changed his story and stated that he was present when Randolph was killed but that it was Rick who committed the crime. Defendant claimed that Randolph and Rick were involved in a physical altercation when defendant entered the house. At one point, defendant stated that he did not know what Rick hit Randolph with, because he did not see it. Defendant later stated that he saw Rick hit Randolph with a piece

of wood while Randolph was on the floor. Defendant stated that blood got onto his clothes when Rick was hitting Randolph. Defendant also stated that blood must have splashed onto his coat when Rick and Randolph were fighting.

¶ 118    Based on this record, we conclude that the State provided ample evidence regarding each of the elements necessary to prove first-degree murder and refute defendant's theory of the case. The evidence of defendant's guilt was strong and not so closely balanced that the jury's verdict may have resulted from the alleged error and not the evidence against defendant. Clearly, there is no reasonable probability that the jury would have acquitted defendant absent the alleged error. As the alleged error was not potentially dispositive, defendant is not entitled to relief under the first prong of the plain-error rule.

¶ 119    Defendant insists that the evidence in this case was closely balanced, because the State's case was "completely circumstantial." However, he cites no authority for the proposition that a case based on circumstantial evidence is inherently close. To the contrary, there is ample authority supporting the opposite proposition. See, *e.g.*, *People v. Belknap*, 2014 IL 117094, ¶ 56 (rejecting the defendant's claim that the evidence against him was closely balanced where strong circumstantial evidence "pointed to [him] as the perpetrator" and excluded any reasonable probability that anyone else was guilty of the crime); *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 26 (holding that evidence was not closely balanced where circumstantial evidence supported the victim's version of events and the defense presented no evidence); *People v. Lopez*, 2012 IL App (1st) 101395, ¶¶ 88-90 (holding that evidence was not closely balanced under first prong of the plain-error rule where circumstantial evidence supported the testimony of the State's witnesses while the defendant's version of events "strained credulity").

¶ 120    In addition, defendant is not entitled to relief under the second prong of the plain-error rule. Second-prong plain error is akin (although not limited) to structural errors, *i.e.*, a systematic error that serves to erode the integrity of the judicial process and undermine the fairness of the defendant's trial. *People v. Clark*, 2016 IL 118845, ¶ 25; *People v. Thompson*, 238 Ill. 2d 598, 608-09 (2010). Illinois courts look to the type of errors the Supreme Court has identified as structural to determine whether the error being considered is comparable. *People v. Moon*, 2022 IL 125959, ¶ 30. The limited class of structural errors meeting the standard for second-prong plain error include (1) a complete denial of counsel, (2) trial before a biased judge, (3) racial discrimination in the selection of a grand jury, (4) denial of self-representation at trial, (5) denial of a public trial, and (6) a defective reasonable doubt instruction. *Thompson*, 238 Ill. 2d at 609 (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006)). Here, defendant does not explain how the admission of the preinterrogation video falls into any of the foregoing categories or otherwise served to erode the integrity of the judicial process and undermine the fairness of his trial. He merely suggests that the admission of this evidence called into question the reliability of the verdict. This conclusory statement is insufficient to carry his burden of establishing second-prong plain error. See *People v. Temple*, 2014 IL App (1st) 111653, ¶ 51 (finding the errors the defendant complained of—the admission of prior consistent statements, hearsay testimony from police officers going beyond the scope of explaining police procedure, and prosecutorial misconduct in closing and rebuttal arguments—did not constitute second-prong plain error).

¶ 121                    2. Ineffective Assistance of Counsel

¶ 122    Alternatively, defendant argues that trial counsel was ineffective for failing to preserve this issue for review. To establish a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) counsel's representation was deficient and (2) counsel's deficient

performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984). Because both prongs of the *Strickland* test must be established to succeed on an ineffective-assistance claim, the failure to establish either prong is fatal to the claim. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010). In *People v. White*, 2011 IL 109689, ¶¶ 133-34, the supreme court ruled that the analysis for prejudice under the first prong of the plain-error rule is similar to the analysis for prejudice under a claim of ineffective assistance of counsel. Therefore, defendant's claim of ineffective assistance of trial counsel is meritless where, as here, he cannot show that he was prejudiced under first-prong plain-error analysis.

¶ 123                                       E. Closing Argument

¶ 124   Defendant further complains that, during closing argument, the State improperly urged the jury to consider his behavior in both the preinterrogation video and the ERI in arguing that his demeanor proved his propensity to commit murder. The State responds that the comments about which defendant complains were proper, as they were based on the evidence or reasonable inferences drawn therefrom.

¶ 125   Defendant acknowledges that trial counsel did not object at all to the State's comments during closing argument about which he now complains. Defendant requests, however, that we address this issue under the plain-error doctrine or as a claim of ineffective assistance of counsel.

¶ 126                                       1. Plain Error

¶ 127   As noted above, absent clear or obvious error, no plain-error analysis is necessary. *Wright*, 2017 IL 119561, ¶ 87; *Walker*, 232 Ill. 2d at 124-25. Here, there was no error.

¶ 128   The prosecutor is allowed a great deal of latitude during closing argument. *People v. Nieves*, 193 Ill. 2d 513, 532-33 (2000). Even improper remarks do not merit reversal unless they result in substantial prejudice to the defendant. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994); *People*

*v. Burman*, 2013 IL App (2d) 110807, ¶ 25. "During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from the evidence, respond to comments made by defense counsel that invite response, and comment on the credibility of witnesses." *Burman*, 2013 IL App (2d) 110807, ¶ 25. In determining whether comments made during closing argument were improper, we review the closing argument in its entirety and view remarks in context. *Burman*, 2013 IL App (2d) 110807, ¶ 25.

> "The standard of review applied to arguments by counsel is similar to the standard used in deciding whether a plain error was made: comments constitute reversible error only when they engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from those comments." *Nieves*, 193 Ill. 2d at 533.

¶ 129   Here, defendant argues that the State's "pervasive use of character evidence to argue to the jury that [he], because of his short temper, was likely to be Randolph's murderer so permeated the proceedings that it undermined the fundamental fairness of the trial and cast doubt on the integrity of the jury's verdict." Defendant notes that, at one point, the prosecutor commented, "And if there's one other thing you can see in the video, it's this guy is short-fused. He angers easily over the wrong things." Shortly later, the prosecutor remarked,

> "[I]f you look at that six, seven hours of temper and the way he's yelling and cussing, is that an example of what he's all about? Is it possible a person like that could live with anybody? *** [H]e came over and whatever was bothering him, he then took it out on *** Randolph."

At another point, the prosecutor commented, "And, again, when you look at the six hours of him being a jerk, you wonder, you know, 'What sets this guy off?' " During rebuttal, the prosecutor said:

> "You saw his demeanor, especially during the start, during those silent periods which were punctuated by his outbursts, his belligerence. You saw his demeanor. *** This is a person who's capable of going from zero to 100 like that. *** And that's what happened here. Something happened, he lost his cool, and he whacked Samuel Randolph multiple times."

Defendant claims that, by positing that his demeanor in itself made it more likely that he committed murder, these comments crossed the line of what is acceptable for the State to argue in closing arguments. We agree that the State's assertions regarding defendant's demeanor were improper. After reviewing the State's closing argument in its entirety, however, we cannot say that the State's comments during closing argument were substantially prejudicial.

¶ 130   The comments that defendant references constitute 11 sentences of approximately 60 pages of the State's closing argument. Moreover, the trial court repeatedly advised the jury that closing arguments are not evidence. Immediately after the jury was sworn in, the court stated, "[j]ust as opening statements are not evidence, neither are closing arguments at the end of the case." Before the start of closing arguments, the court reiterated to the jury that "[w]hat the lawyers say during the [closing] arguments is not evidence and should not be considered by you as evidence." At that time, the court also advised the members of the jury that they were to rely on their "own recollection of the evidence" and that if an attorney "makes a statement that is not based on the evidence or reasonable inferences to be drawn from the evidence, [jury members] should disregard the statement." After closing arguments were completed, while reading to the jury the full complement of instructions, the court orally instructed the jury that closing arguments "are made by the attorney to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence." Additionally, the jury was

provided with a written instruction that closing arguments are not evidence. Thus, while the State's comments about defendant's demeanor were improper, we cannot say, based on the record before us, that the State's comments constituted reversible error. See *Williams*, 2022 IL 126918, ¶ 45 (holding that prosecutor's statement during closing argument that "the defense has subpoena powers just like the government" was not substantially prejudicial where the statement was brief, the State acknowledged that it had the burden of proof, and the trial court instructed the jury on the burden of proof, the presumption of innocence, and that closing arguments are not evidence).

¶ 131 Attempting to support his claim that the State's remarks constituted reversible error, defendant directs us to *People v. Bedoya*, 325 Ill. App. 3d 926 (2001), and *People v. Liner*, 356 Ill. App. 3d 284 (2005). Defendant's reliance on these cases is misplaced. Defendant notes that in *Bedoya*, the court ordered a new trial after finding that the State improperly commented on other-crimes evidence during closing argument. However, the State's remarks during closing were just one of multiple factors that the court cited in support of reversal. *Bedoya*, 325 Ill. App. 3d at 940-43 (finding that, even if other-crimes evidence was slightly relevant, the danger of unfair prejudice was compounded by multiple factors that outweighed any probative value, including an impermissible "trial within a trial," the failure of the court to provide a timely limiting instruction regarding the other-crimes evidence, and the trial court's decision not to tell the jury that the defendant was acquitted of charges related to the other crimes). Defendant also observes that the *Liner* court found reversible error where the State was allowed to suggest during closing argument that the defendant was able to buy a nice car and clothes due to selling illegal drugs—statements that the court found irrelevant to proving whether the defendant was guilty of the crimes charged (armed robbery and home invasion). Again, however, the State's remarks during closing argument

were just one of several errors, the cumulative effect of which the *Liner* court found had prejudiced the defendant and denied him a fair trial. *Liner*, 356 Ill. App. 3d at 291.

¶ 132    Aside from the State's remarks during closing argument not being substantially prejudicial, we conclude that reversal is unwarranted under the plain-error rule. As noted above, defendant is not entitled to relief under the first prong of the plain-error rule because the evidence in this case was not "so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence." Additionally, defendant is not entitled to relief under second-prong plain error, as defendant does not explain how the State's remarks served to erode the integrity of the judicial process and undermine the fairness of his trial. He simply concludes that he is entitled to relief because the State's remarks allowed the jury to consider completely irrelevant and prejudicial evidence. However, the error defendant alleges falls far short of the types of structural errors discussed earlier or any other error that may erode the integrity of the judicial process or undermine the fairness of a trial. As such, we reject defendant's claim of second-prong plain error. See *Temple*, 2014 IL App (1st) 111653, ¶ 51 (finding the errors the defendant complained of—the admission of prior consistent statements, hearsay testimony from police officers going beyond the scope of explaining police procedure, and prosecutorial misconduct in closing and rebuttal arguments—did not constitute second-prong plain error). Finally, defendant's claim of ineffective assistance of trial counsel is meritless where he cannot show that he was prejudiced under first-prong plain-error analysis. See *White*, 2011 IL 109689, ¶¶ 133-34.

¶ 133                                  F. Photographs of the Victim

¶ 134    Finally, defendant argues that he was denied his right to a fair trial because the trial court admitted into evidence and published to the jury multiple "gruesome" crime-scene and autopsy photographs of Randolph. Specifically, defendant challenges the State's introduction of four

photographs taken at the crime scene (State exhibit Nos. 130, 136, 137, and 138) and two autopsy photographs (State exhibit Nos. 65 and 66). The crime-scene photographs show Randolph's body from various angles and distances lying on the floor in a pool of blood, with blood spatter on the walls and floor surrounding him. One of the autopsy photographs shows a hole in Randolph's forehead with a ruler to show the dimensions of the wound. The other autopsy photograph shows Randolph's mouth with his upper and lower lips peeled back to show broken teeth and lacerations on the inside of the lips. Defendant contends that the photos were unfairly prejudicial and served no purpose other than to incite the jurors in an emotional case, especially where Dr. Peters, the forensic pathologist, testified to the undisputed cause of death and other admitted exhibits showed the mechanism and severity of Randolph's injuries.

¶ 135    The State concedes that the photographs at issue were gruesome. Nevertheless, it argues that the trial court properly allowed the admission of the photographs because they accurately depicted the nature of Randolph's injuries, assisted the jury in understanding the testimony of Dr. Peters, and were relevant to establish whether the multiple blows that caused Randolph's injuries also caused the blood spatter on defendant's clothing.

¶ 136    At the outset, we conclude that defendant failed to preserve this issue for review. As noted earlier, to preserve an issue on appeal, a defendant must both object to the purported error at trial and include it in a written posttrial motion. *Glasper*, 234 Ill. 2d at 203; *Hauck*, 2022 IL App (2d) 191111, ¶ 32. In this case, defendant acknowledges that, although defense counsel objected at trial to the autopsy photographs, he did not challenge them in a posttrial motion. Moreover, defendant admits that defense counsel did not object at all to the crime-scene photographs. Given this record, defendant has forfeited his claim that the trial court improperly allowed the jury to view the photographs at issue. Defendant requests, however, that we address the issue as a matter of

ineffective assistance of counsel. See *People v. Eddmonds*, 101 Ill. 2d 44, 64-65 (1984) (electing to consider forfeited issue where the defendant claimed that the forfeiture was due to trial counsel's failure to properly object, which denied him effective assistance of counsel). The State responds that, because the photographs at issue were properly admitted into evidence, defendant cannot show that defense counsel was ineffective for failing to preserve the issue for appellate review.

¶ 137   As noted previously, all relevant evidence is admissible, except as otherwise provided by law. Ill. R. Evid. 402 (eff. Jan. 1, 2011); *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 97. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). When a defendant in a murder trial pleads not guilty, the State is allowed to prove every element of the crime charged and every relevant fact. *People v. Chapman*, 194 Ill. 2d 186, 219-20 (2000); see also *People v. Maggette*, 195 Ill. 2d 336, 353 (2001) (noting that the State is required to prove each element of the charged offense beyond a reasonable doubt, whether or not the defendant contests them). Photographs of a deceased crime victim may be relevant for various reasons, including (1) to prove the nature and extent of injuries; the force necessary to inflict the injuries; the position, condition, and location of the body; and the manner and cause of death, (2) to corroborate a defendant's confession, and (3) to aid in understanding the testimony of a pathologist or other witness. *People v. Terrell*, 185 Ill. 2d 467, 495 (1998). In ruling on the admissibility of such photographs, the trial court must weigh each exhibit's prejudicial effect against its probative value, keeping in mind that "[c]ompetent evidence should not be excluded merely because it may arouse feelings of horror or indignation." *People v. Degorski*, 2013 IL App (1st) 100580, ¶ 100. If evidence has sufficient probative value, it may be admitted despite its gruesome or inflammatory nature. *Degorski*, 2013

IL App (1st) 100580, ¶ 100. Only when a photograph serves no purpose other than to inflame and prejudice the jury must it be excluded. *People v. Christen*, 82 Ill. App. 3d 192, 197 (1980). The decision to admit photographs into evidence is a matter left to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of that discretion. *People v. Brown*, 172 Ill. 2d 1, 40-41 (1996). An abuse of discretion occurs only when the trial court's ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would adopt the trial court's view. *Baez*, 241 Ill. 2d at 106.

¶ 138  In this case, we conclude that the trial court did not abuse its discretion in admitting the photographs at issue. The photographs were relevant, as they provided evidence of Randolph's injuries and the manner and cause of his death. The photographs demonstrated the nature, location, and force of the blunt trauma from which Randolph died. As such, they were highly probative in evaluating whether the offense was committed in an exceptionally brutal or heinous manner indicative of wanton cruelty, as alleged in the indictment. Further, the autopsy photographs (State exhibit Nos. 65 and 66) assisted the jury in understanding the testimony of Dr. Peters regarding the nature of Randolph's injuries. Notably, the two photographs showed details of Randolph's injuries such as the dimensions of the head wound, the broken teeth, and the lacerations to his lips. As defense counsel conceded at trial, none of the other photographs included a method to gauge the measurements of Randolph's head wound or depicted the nature of the injuries to his mouth.

¶ 139  Additionally, the photos in questions were relevant to establish a fact in issue. The State's theory of the case was that defendant repeatedly struck Randolph in the head with the 40-inch wooden stick. The State argued that the force with which defendant struck Randolph caused some of his blood to spatter onto the walls and floor at the crime scene as well as onto defendant's clothes and shoes. The defense countered that the relatively small amount of blood discovered on

defendant's clothes and shoes was inconsistent with him being the person who beat Randolph to death. The defense argued that the blood on defendant's clothes was more consistent with defendant encountering an "extremely bloody crime scene" while intoxicated, seeing the victim dead, and stumbling out of the house. Thus, the jury had to decide whether the blood spatter on defendant's clothes and shoes—which Aper testified contained both Randolph's and defendant's DNA—resulted from defendant beating Randolph with the wooden stick or from defendant encountering a bloody crime scene after someone else had already killed the victim. Given the probative value of the photographs, we cannot say that the trial court abused its discretion in admitting these photographs at defendant's trial.

¶ 140  Defendant nevertheless contends that the trial court erred in admitting the two autopsy photos, as they were "duplicative, gory, and unfairly prejudicial." Defendant acknowledges that the State is allowed to prove its case, and, in this instance, part of its case was to show the mechanism and severity of Randolph's injuries. Defendant insists, however, that this task was accomplished through other autopsy photos—to which there was no objection—as well as Dr. Peters's testimony. Showing additional gruesome close-ups of Randolph's injuries, defendant reasons, served only to inflame the emotions of the jury and resulted in prejudice to him. However, as defense counsel conceded at trial, none of the other autopsy photographs included a ruler to establish the dimensions of Randolph's head wound or depicted the nature of the injuries to his mouth. Thus, we cannot say that the two autopsy photos were duplicative of any other autopsy photograph admitted into evidence. And although the photographs at issue were "gory," they were admissible because they were relevant to establish a material fact, *i.e.*, the manner and cause of death; the nature, location, and force of the blunt trauma from which Randolph died; and whether

the offense was committed in an exceptionally brutal or heinous manner indicative of wanton cruelty. See *Degorski*, 2013 IL App (1st) 100580, ¶ 100.

¶ 141   Similarly, defendant insists that, while it may have been necessary to show the jury one crime-scene photograph, showing them any additional photographs was excessive and served only to inflame the emotions of the jury and unfairly prejudice him. Again, we disagree. As noted above, the crime-scene photographs in question showed Randolph lying on the floor in a pool of blood, with blood spatter on the walls and floor surrounding him. The photos were taken at different angles and distances. The photos assisted the jury in gauging whether the blood spatter on defendant's clothes and shoes resulted from defendant beating Randolph with the wooden stick or from defendant encountering a bloody crime scene after someone else had already killed the victim.

¶ 142   In light of the foregoing, we find no merit in defendant's claim of ineffective assistance of counsel. To demonstrate ineffective assistance of counsel, a defendant must show defense counsel's performance was deficient and a reasonable probability exists that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Albanese*, 104 Ill. 2d at 526-27. Moreover, as a general rule, it is not ineffective assistance to fail to undertake a futile act. See *People v. Wilson*, 164 Ill. 2d 436, 454 (1994) (holding that trial counsel's failure to file a motion does not establish incompetent representation, especially when that motion would be futile); *People v. Smith*, 2014 IL App (1st) 103436, ¶ 64 (observing that defense counsel is not required to make futile motions or objections in order to provide effective assistance). Having concluded that the trial court did not abuse its discretion in admitting the photographs at issue, defense counsel's failure to object to the admission of the crime-scene photographs or challenge in a posttrial motion the admission of the crime-scene or autopsy

photographs cannot constitute deficient performance or result in prejudice to defendant. As a result, defendant's ineffective assistance of counsel claim fails.

¶ 143   In short, we reject defendant's argument that the photographs at issue were unfairly prejudicial. Although the photographs were graphic, they were relevant to show the location and extent of the injuries, as well as their character and depth. In addition, the photographs aided the jury in understanding Dr. Peters's testimony and were relevant to establish a fact in issue. Since the photographs would have been admissible over objection, defense counsel's performance cannot be viewed as deficient or prejudicial. As such, defendant cannot show that defense counsel was ineffective for failing to challenge the autopsy photographs in a posttrial motion or the crime scene photographs at all.

¶ 144                               III. CONCLUSION

¶ 145   For the reasons set forth above, we affirm the judgment of the circuit court of Winnebago County.

¶ 146   Affirmed.

***People v. Williams*, 2022 IL App (2d) 200455**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 19-CF-1453; the Hon. Debra D. Schafer, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Abigail Hogan Elmer, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, Edward R. Psenicka, and Miles J. Keleher, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |